# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT
CAPTION: Quigley Company, Inc., Appellant v. G-I Holdings, Inc., et al.
USCA NO.: 13-3335, 13-3336

LOWER COURT or AGENCY and DOCKET NUMBER:
United States District Court, District of New Jersey, Civil Action No. 2:12-cv-06933

NAME OF
JUDGE: Hon. Dennis M. Cavanaugh, U.S.D.J.

**Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:**

1.  This appeal involves proofs of claim the Appellants filed in the Appellee's bankruptcy case. The Appellants' bankruptcy claims arise from the Appellee's contractual obligation to contribute funds for the joint defense of asbestos-related actions.

2.  Case 13-3335 has been consolidated with case 13-3336. Together the Appellants are (1) United States Gypsum Company and (2) Quigley Company, Inc. The Appellee is G-I Holdings, Inc., et al.

3.  The Appellants request that the Court reverse the Bankruptcy Court and District Court orders and opinions and determine that the Appellants hold valid claims against the Appellee: (a) with respect to United States Gypsum Company, in the amount set forth its proof of claim; and (b) with respect to Quigley Company, Inc., as set forth in its proof of claim, in an unliquidated amount.

4.  This is an appeal from the order and opinion of the District Court, which affirmed the Bankruptcy Court's grant of summary judgment in favor of the Appellee, thereby disallowing and expunging the claims the Appellants filed against the Appellee in its bankruptcy case.

**LIST and ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

1.    United States Gypsum Company, Pfizer, Inc. and Quigley Company, Inc. v. G-I Holdings Inc., et al., No 2:12-cv-06933 (DMC) (D. N.J.) (Docket No. 19, Opinion);

2.    United States Gypsum Company, Pfizer, Inc. and Quigley Company, Inc. v. G-I Holdings Inc., et al., No 2:12-cv-06933 (DMC) (D. N.J.) (Docket No. 20, Order);

3.    In re: G-I Holdings Inc., et al., (f/k/a GAF Corporation) Nos. 01-30135 (RG) and 01-38790 (RG) (Bankr. Docket No. 10672, Opinion);

4.    In re: G-I Holdings Inc., et al., (f/k/a GAF Corporation) Nos. 01-30135 (RG) and 01-38790 (RG) (Bankr. Docket No. 10695, Order).

**Provide a short statement of the factual and procedural background which you consider important to this appeal:**

The Appellants, Appellee, and certain other companies entered into an agreement to allocate the costs associated with their role as defendants in thousands of asbestos-related personal injury lawsuits. The Appellee commenced bankruptcy proceedings prior to fulfilling its obligations under the cost sharing agreement. As a result, the Appellants satisfied certain of the Appellee's obligations under the cost sharing agreement and filed proofs of claim in the Appellee's bankruptcy case in amounts equal to the obligations the Appellants satisfied on the Appellee's behalf. The Bankruptcy Court entered an order expunging the Appellants' respective proofs of claim, incorrectly construing the cost sharing agreement to preclude the Appellants from recovering amounts the Appellants paid on the Appellee's behalf. The District Court, also incorrectly interpreted the cost sharing agreement in a manner contrary to its plain meaning, affirmed the Bankruptcy Court. Appellants provided timely notice of this appeal.

**Identify the issues to be raised on appeal:**

Did the District Court for the District of New Jersey commit reversible error in affirming the United States Bankruptcy Court for the District of New Jersey's (i) Opinion (Bankr. Docket No. 10672), entered on August 13, 2012, and (ii) Order Granting Summary Judgment In Favor of G-I Holdings, Inc. Respecting Claims Filed By Certain Former Members of the Center for Claims Resolution, Inc., entered on September 10, 2012 (Bankr. Docket No. 10695), combined which disallowed and expunged the Appellant's claim against G-I Holdings, Inc. (f/k/a GAF Corporation)?

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record this 13th day of August, 2013.

s/John P. Di Iorio
Signature of Counsel

Rev. 04/2010

NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Hon. Dennis M. Cavanaugh |
| G-I Holdings, INC., et al., | : | |
| (f/k/a GAF Corporation) | : | **OPINION** |
| | : | Bankruptcy Case No. 01-30135 (RG) |
| | : | and No. 01-38790 (RG) |
| Debtor. | : | Civil Action No. 2:12-6933 |
| | : | |
| UNITED STATES GYPUM COMPANY, | : | |
| PFIZER, INC. and QUIGLEY COMPANY, | : | |
| INC. | : | |
| | : | |
| Appellant, | : | |
| v. | : | |
| G-I Holdings, INC., | : | |
| Appellee. | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

    This matter comes before the Court upon appeal by United States Gypsum Company, Pfizer, Inc. and Quigley Company Inc. (hereinafter "Appellants" or the "Former Members[1]") of the Bankruptcy Court's August 13, 2012 Opinion ("the Opinion") finding in favor of Appellee G-I Holdings (hereinafter "Appellee" or "G-I") on its motion for Summary Judgment. Pursuant

---

[1] The Bankruptcy Court referred to U.S. Gypsum, Pfizer and Quigley as the "Former Members" of the Center for Claims Resolution, thus for consistency's sake this Court will do the same.

1

to FED. R. CIV. P 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Appellants appeal is **denied** and the Bankruptcy Court's Opinion is **affirmed.**

I.    **BACKGROUND**[2]

Appellants, Appellee G-I and other companies were parties to asbestos personal injury lawsuits. In an effort to resolve these lawsuits efficiently, the companies entered into a contract where they agreed to allocate the costs of settling the thousands of asbestos personal injury claims against them in an agreed upon formula. Under the contract, the parties agreed to create a claims handling organization, the Center for Claims Resolution ("CCR"), that would manage the claims and send out bills to the contracting parties for their share of settlement payments owed under the contractually-agreed formula.

G-I subsequently filed for bankruptcy on January 5, 2001. During the course of G-I's bankruptcy proceeding, a payment dispute arose between the CCR and G-I, which was settled. The Former Members of the CCR objected to this settlement; because the Former Members paid an allocated share of G-I's contractual liability under the Producer Agreement, they filed a claim against G-I for the amounts in paid on G-I's behalf for moneys they believe were owed to them, not the CCR. After initially objecting to the claims of the Former Members in the Bankruptcy Court, G-I filed a motion for summary judgment in support of its objection. On August 13, 2012, the Bankruptcy Court issued its Opinion granting the motion for summary judgment in favor of G-I. The Bankruptcy Court made the following determinations:

1. The Former Members did not have claims against G-I because they had waived, under the Producer Agreement, claims against other CCR members for contribution and indemnity with respect to "asbestos-related claims" (Opinion 36);

---

[2] This Court need not recite the entire procedural and factual history of this case, as the Hon. Rosemary Gambardella of the Bankruptcy Court did an efficient and clear job in the opinion below. For a more complete background, see In Re: G-I Holdings, Inc. et al, Bankruptcy Court No. 01-30135 (RG) and 01-38790 (RG) (ECF No. 1-1).

2. The claims of the Former Members, under Delaware law, are "derivative" of claims of the CCR, rather than "direct" claims (Opinion 50-51; and
3. Allowing the Former Members to recover on claims against G-I would constitute an "impermissible double recovery" against G-I, since CR had already resolved its claims against G-I pursuant to the CCR settlement (Opinion 52).

Appellant U.S. Gypsum filed a Notice of Appeal on October 26, 2012 (ECF No. 1) and a supporting brief on November 26, 2012. (Appellant's Br., ECF No. 5). Appellants Pfizer and Quigley adopted the arguments and briefs of U.S. Gypsum, for both the moving brief and the reply brief. (Docket No. 12-cv-6935, November 26, 2012, ECF No. 6). Appellee G-I Holdings filed a Response Brief on December 10, 2012. (Appellee's Br., ECF No. 8). Appellants filed a Reply Brief on December 21, 2012. (Appellant's Reply, ECF No. 14).

## II.   STANDARD OF REVIEW

This Court has jurisdiction over final judgments and orders of the Bankruptcy Court pursuant to 28 U.S.C. § 158. A district court applies a "clearly erroneous" standard to the bankruptcy judge's findings of fact and reviews the bankruptcy judge's legal conclusions *de novo*. See FED. R. BANKR. P. 8013; In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995). A factual finding is clearly erroneous if, in reviewing all the evidence, the reviewing court is left with the "definite and firm conviction that a mistake has been committed," even if there is evidence to support the finding. In re Allegheny Int'l, Inc., 333 U.S. 869, 173 (3d. Cir. 1992); (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). A district court reviews the bankruptcy court's "exercise of discretion for abuse thereof." Manus Corp. v. NRG Energy, Inc., (In re O'Brien Envtl. Energy, Inc.), 188 F.3d 116, 122 (3d. Cir. 1999). "A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts." Id.

3

III.   **DISCUSSION**

The sole issue on appeal is whether the Former Members of the CCR can assert a breach

of contract claim against G-I.  As a threshold matter, the Bankruptcy Court found that:

> the Producer Agreement signatories intended to establish a cooperative, collective
> process for allocating asbestos liability, and in furtherance of that process,
> delegated to the new corporate entity the exclusive right to seek collection from a
> member that did not make a payment required under the Producer Agreement's
> allocation of a pro rata share of liability and expenses.

(Opinion 33). This Court agrees; furthermore, when interpreting contracts, priority must be given

to the intention at the time the contract is formed. See E.I. du Pont de Nemours & Co. v. Shell

Oil Co., 498 A. 2d 1108, 1114 (Del. 1985); see also GMG Capital Invs., LLC v. Athenian

Venture Partners I, L.P., 36 A.3d 776, 779 (Del. 2012) (giving priority to parties' intentions as

reflected in the four corners of the contract); Lorillard Tobacco Co. v. Am. Legacy Found., 903

A.2d 728, 738 (Del. 2006) (finding that courts are to "effectuate the parties' intent"); Hfn, Inc. v.

Intel Corp., 2007 WL 2801393, at *9 (Del. Ch. May 2, 2007) (quoting Eagle Indus., Inc. v.

DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)); Comrie v. Enterasys Networks,

Inc., 837 A.2d 1 (Del. Ch. 2003) (holding that attempting, within reason, to fulfill the reasonable

shared expectations of parties at the time they contracted is the primary goal of contract

interpretation). Courts should also give effect to all contract provisions. In E.I. du Pont de

Nemours & Co. v. Shell Oil Co., the Delaware Supreme Court held that:

> [i]n upholding the intentions of the parties, a court must construe the agreement as
> a whole, giving effect to all provisions therein. . . . Moreover, the meaning which
> arises from a particular portion of an agreement cannot control the meaning of the
> entire agreement where such inference runs counter to the agreement's overall
> scheme or plan . . . . To do so would be to violate the cardinal rule of contract
> construction that, where possible, a court should give effect to all contract
> provisions.

4

498 A.2d at 1113-14 (internal citations omitted). The Bankruptcy Court stated that "[t]he meaning from one provision of a contract cannot control if that provision's meaning would contradict the meaning of the entire contract. Courts should give effect to all contract provisions." (Opinion 32). While Appellants argue that the Bankruptcy Court erred in finding that they could not assert a claim for breach of contract, this Court agrees with the Bankruptcy Court and finds that the Producer Agreement delegated the right to enforce the claims in question to the CCR. As Appellees state, "the clear purpose of the Producer Agreement was to eliminate costly and time-consuming litigation among its members and. . . to allow Participating Producers to resolve asbestos-related claims expeditiously and efficiently." (Appellee's Br. 16). Each provision of the contract should be read through this lens. The Bankruptcy Court undertook a thorough examination of the contractual provisions of the Producer Agreement, and found that in order to effectuate the parties' intent, Participating Producers, through the Producer Agreement "(i) elected to rely exclusively on the CCR to settle and pay asbestos claims and to collect payments from members, and (ii) agreed that upon termination of CCR membership, former members would continue to be bound by obligations incurred during the period it was a member." (Opinion 37).

Although the Court agrees with the reasoning of the Bankruptcy Court and affirms the holding that the Appellants were contractually barred from pursuing a breach of contract claim against Appellee independent of the CCR, the Court will address Appellant's two main arguments.[3]

First, Appellants argue that the Bankruptcy Court ignored the plain language of Section X of the Producer Agreement, which they argue specifically provides that the Former Members

---

[3] Appellants also make arguments regarding the Bankruptcy Court's discussion of direct versus derivative claims and the problem of "double recovery." Because this Court agrees with the Bankruptcy Court that the contract language bars Appellants claim, this Court does not find it necessary to address these issues.

have a right to bring a breach of contract claim. Section X is called "Third Party Rights" and

provides:

> The Agreement is intended to confer rights and benefits only upon Participating
> Producers, Supporting Insurers that are paying unallocated expenses incurred by
> the Center and the Center, and is not intended to confer any rights or benefits
> upon any other persons. No person other than the Center, a signatory hereto or a
> Supporting Insurer that is paying unallocated expenses incurred by the Center
> shall have any legally enforceable rights under the Agreement. All rights of action
> for any breach of this Agreement by any signatory hereto are hereby reserved to
> the Center, Participating Producers and to Supporting Insurers that are paying
> unallocated expenses incurred by the Center.

Appellants argue "if the parties to the Producer Agreement intended the Bankruptcy

Court's incorrect interpretation of Section X, the provision would not have explicitly stated that

the member companies have the right to bring breach of contract claims against each other."

(Appellant's Br. 16-17). However, the Bankruptcy Court held that "when read in its entirety, § X

clearly and unambiguously limits the rights of third parties and avoids the creation of unintended

third party beneficiaries." (Opinion 36-37). This Court agrees. Section X is titled "Third Party

Rights" and the language is meant to limit just that. Read in a vacuum, the final sentence does

reserve a cause of action for the Center in addition to the Participating Producers, but this

reading cannot hold water when read in concert with the other provisions and when taken in the

context of the section's title. Appellees argue:

> Where, as here, the Producer Agreement has created a payment obligation to the
> CCR and a mechanism by which the CCR – and only the CCR – may enforce that
> obligation, nothing in the non-specific language of the last sentence of Section X
> somehow empowers a Participating Producer to bring its own suit to enforce the
> same obligation.

(Appellee's Br. 25). This Court agrees.

Appellants next argue that the Bankruptcy Court "erred in finding that a permissible, but

not mandatory, arbitration provision in the Producer Agreement barred members from suing each

other for breach of contract." (Appellant's Br. 18). Again, this Court disagrees with Appellants argument. In keeping with the purpose of the Producer Agreement, the Former Members delegated to the CCR enforcement of the share payment provisions, and Section XIV ¶ 4 gives the CCR the power of enforcement to the Center and the Center's Board of Directors *on behalf* of the Center's Participating Producers. While Appellants argue that this provision is permissible, there is no other provision in the Producer Agreement that establishes any remedy for breach of a payment obligation, and this section clearly provides an express remedy. Indeed the CCR has already exercised that remedy on behalf of the Former Members. Again reading the contract as a whole, this Court is not convinced that this provision is merely permitting arbitration for a breach of a payment obligation while leaving open the option for independent members to bypass the sole authority of the CCR to remedy it on their own.

## IV.   CONCLUSION

For the foregoing reasons, Appellants appeal is **denied** and the Bankruptcy Court's Opinion is **affirmed**. An appropriate Order follows this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:        June 26, 2013
Original:    Clerk's Office
cc:          Hon. Joseph A. Dickson, U.S.M.J.
             All Counsel of Record
             File

7

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CLOSED

|  |  |  |
|---|---|---|
| In re: | : | Hon. Dennis M. Cavanaugh |
| G-I Holdings, INC., et al., | : |  |
| (f/k/a GAF Corporation) | : | **ORDER** |
|  | : | Bankruptcy Case No. 01-30135 (RG) |
|  | : | and No. 01-38790 (RG) |
| Debtor. | : | Civil Action No. 2:12-6933 |
|  | : |  |
| UNITED STATES GYPUM COMPANY, | : |  |
| PFIZER, INC. and QUIGLEY COMPANY, | : |  |
| INC. | : |  |
|  | : |  |
| Appellant, | : |  |
|  | : |  |
| v. | : |  |
| G-I Holdings, INC., | : |  |
|  | : |  |
| Appellee. | : |  |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon appeal by United States Gypsum Company,

Pfizer, Inc. and Quigley Company Inc. (hereinafter "Appellants") of the Bankruptcy Court's

August 13, 2012 Opinion ("the Opinion") finding in favor of Appellee G-I Holdings (hereinafter

"Appellee") on its motion for Summary Judgment. Pursuant to FED. R. CIV. P 78, no oral

argument was heard. After careful consideration and for the reasons set forth in the Opinion filed

on this day,

IT IS on this *24* day of June, 2013

**ORDERED** that Appellants appeal is **denied** and the Bankruptcy Court's Opinion is

**affirmed.**

Dennis M. Cavanaugh, U.S.D.J.

Original:      Clerk's Office
cc:            All Counsel of Record
               File

FILED

JAMES J. WALDRON, CLERK

AUG 1 3 2012

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In Re:

G-I Holdings, INC., et al.,
(f/k/a GAF Corporation),

Debtors.

Chapter 11

Case No. 01-30135 (RG) and 01-38790 (RG)
(Jointly Administered)

OPINION

APPEARANCES:

Riker, Danzig, Scherer, Hyland & Perretti, LLP
BY: Dennis J. O'Grady, Esq.
    Mark E. Hall, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
*Co-counsel for the Reorganized Debtors*

Quinn Emanuel Urquhart & Sullivan, LLP
BY: Andrew J. Rossman, Esq.
    Scott C. Shelley, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010
*Co-counsel for the Reorganized Debtors*

Sandak, Hennesey & Greco, LLP
BY: Marc J. Kurzman, Esq.
707 Sumner Street, Suite 300
Stamford, Connecticut 06901
*Co-counsel for the Reorganized Debtors*

Greenberg Traurig, LLP
BY: Alan J. Brody, Esq.
    Alexander J. Anglim, Esq.
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932
*Attorney(s) for Pfizer, Inc.*

Jones Day
BY:  Dan B. Prieto, Esq.
2727 North Harwood Street
Dallas, Texas 75201-1515
*Attorney(s) for United States Gypsum Company*

Wilk Auslander, LLP
BY:  Stephen D. Hoffman, Esq.
1515 Broadway Avenue, 43rd Floor
New York, New York 10036
*Attorney(s) for Quigley Company, Inc.*

Rosemary Gambardella, Bankruptcy Judge

MATTER BEFORE THE COURT

This matter comes before the Court on the Motion of G-I Holdings, Inc. for Summary

Judgment Respecting Claims of Three Former Members of the Center for Claims Resolution,

Inc.: (1) Quigley Co., Inc.; (2) United States Gypsum Co.; and (3) Pfizer, Inc., pursuant to Rule

56 of the Federal Rules of Civil Procedure, made applicable in bankruptcy cases by Rule 7056 of

the Federal Rules of Bankruptcy Procedure.  On February 9, 2011, this Court held a hearing and

reserved decision.  The following constitutes the Court's findings of fact and conclusions of law.

2

STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. Background

The Court need not recite the entire procedural history of this case, but some background is necessary to adjudicate the instant claims objection.[1]  On January 5, 2001, G-I Holdings, Inc. ("G-I") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and continued to operate its business as a debtor-in-possession.  On August 3, 2001, ACI, Inc. ("ACI"), a subsidiary of G-I, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to this Court's Order on October 10, 2001, the two cases have been jointly administered.[2]

On January 25, 2001, the Office of the U.S. Trustee appointed the Official Committee of Unsecured Creditors pursuant to 11 U.S.C. § 1102(a), ECF No. 87, and on October 10, 2001, the Court appointed C. Judson Hamlin as Legal Representative—a fiduciary representative of the interests of persons holding present and future asbestos-related claims against G-I, ECF No. 603. Chief Judge Garrett Brown of the U.S. District Court for the District of New Jersey and this

---

[1] For a more complete procedural history, see *In re G-I Holdings, Inc.*, 472 B.R. 263 (Bankr. D.N.J. 2012); *In re G-I Holdings, Inc.*, 443 B.R. 645 (Bankr. D.N.J. 2010); *United States v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 2009 WL 4911953 (D.N.J. Dec. 14, 2009); *In re G-I Holdings, Inc.*, 2006 WL 2595264 (D.N.J. Sept. 8, 2006); *In re G-I Holdings, Inc.*, 2006 WL 2403531 (Bankr. D.N.J. Aug. 11, 2006); *Official Comm. of Asbestos Claimants v. Bldg. Materials Corp. of Am. (In re G-I Holdings, Inc.)*, 338 B.R. 232 (Bankr. D.N.J. 2006), *vacated*, 2006 WL 1751793 (D.N.J. Jun. 21, 2006); *G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*, 328 B.R. 691 (D.N.J. 2005); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313 (3d Cir. 2004); *G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*, 380 F. Supp. 2d 469 (D.N.J. 2005); *Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, 318 B.R. 66 (D.N.J.), *aff'd*, 122 F. App'x 554 (3d Cir. 2004); *In re G-I Holdings, Inc.*, 218 F.R.D. 428 (D.N.J. 2003); *In re G-I Holdings, Inc.*, 2003 WL 22273256 (D.N.J. Aug. 8, 2003); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 502 (D.N.J. 2003); *United States v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 222 (D.N.J. 2003); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 211 (D.N.J. 2003); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 327 B.R. 730 (Bankr. D.N.J. 2005); *In re G-I Holdings, Inc.*, 323 B.R. 583 (Bankr. D.N.J. 2005); *G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.)*, 313 B.R. 612 (Bankr. D.N.J. 2004); *In re G-I Holdings, Inc.*, 308 B.R. 196 (Bankr. D.N.J. 2004); *In re G-I Holdings, Inc.*, 292 B.R. 804 (Bankr. D.N.J. 2003); *G-I Holdings, Inc. v. Hartford Accident & Indem. Co. (In re G-I Holdings, Inc.)*, 278 B.R. 376 (Bankr. D.N.J. 2002); *G-I Holdings, Inc. v. Reliance Ins. Co. (In re G-I Holdings, Inc.)*, 278 B.R. 725 (Bankr. D.N.J. 2002).

[2] For ease of reference, the Reorganized Debtors will be collectively referred to as "Debtors" or "G-I."

3

Court, by Order dated November 12, 2009, jointly approved the Debtors' Eighth Amended Joint

Plan of Reorganization. ECF No. 9787.

### B. *G-I Background*

G-I is the successor-in-interest to GAF Corporation ("GAF"), an entity named in

approximately 500,000 asbestos-related lawsuits. *See G-I Holdings, Inc. v. Parties Listed On Ex.*

*A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 621 (Bankr. D.N.J. 2004). The Committee submitted

that, as successor-in-interest to GAF, G-I remained liable for approximately 150,000 asbestos-

related lawsuits filed but unresolved as of the Petition Date and for unknown numbers of

asbestos-related claims that would be filed in the future. *Id.*

In early 1994, GAF Building Materials Corporation, an indirect subsidiary of GAF,

formed Building Materials Corporation of America ("BMCA"), a wholly-owned subsidiary

corporation.[3] BMCA received substantially all of the assets of GAF's roofing products business

and expressly assumed $204 million of asbestos-related liability. G-I indemnified BMCA

against any additional asbestos-related liability; BMCA is G-I's primary operating subsidiary

and principal asset.[4] *Id.*

### C. *The Center for Claims Resolution, Inc.*

The Center for Claims Resolution, Inc. (CCR) is a non-profit, non-stock corporation

organized under the General Corporation Law of Delaware, Del. Code Ann. tit. 8, § 101 *et seq.*

The CCR was incorporated in September 1988 to "administer and arrange for the evaluation,

settlement, payment, and defense of asbestos-related bodily injury claims." CCR Certif. of

Incorp. art. III, Rossman Decl. ex. 1, at 2, July 15, 2010, ECF No. 10275-3.

---

[3] BMCA is not a debtor within the meaning of 11 U.S.C. § 101(13) in this or any other proceeding.
[4] Although BMCA claims it never manufactured any products containing asbestos, the company has been named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF since September 2000. These claims are based on theories of successor liability or alter ego. *In re G-I Holdings, Inc.*, 313 B.R. at 621.

The Producer Agreement Concerning Center for Claims Resolution ("Producer Agreement") established the CCR as a claims handling facility for its members, all "producers"[5] of asbestos or asbestos-containing products. *See* By-Laws of Center for Claims Resolution art. III § 1, Rossman Decl. ex. 2, July 15, 2010, ECF No. 10275-4 ("CCR By-Laws"). The "Participating Producers"[6] were named in a "substantial number" of asbestos-related personal injury claims and "deem[ed] it beneficial to have an organization that [would] administer and handle asbestos-related claims on behalf of more than one Producer," in order to, "on behalf of all Participating Producers, resolve meritorious asbestos-related claims in a fair and expeditious manner and, where necessary, defend asbestos-related claims efficiently and economically." Producer Agreement, Rossman Decl. ex. 3, at 1-2, July 15, 2010, ECF No. 10275-5.[7] The Participating Producers also based the Producer Agreement on a "desire to enter into a constructive relationship with one another and to resolve any cross or counter claims that [the Producers] may have against each other." *Id.* at 2.

Pursuant to its Certificate of Incorporation and By-Laws, the CCR issued no capital stock, but had members, who initially included all Producer Agreement signatories. A five-person Board of Directors, made up of the CCR's Chief Executive Officer and four directors who are employed by different members, manage its affairs. CCR By-Laws art. III § 1-4, art. V; CCR Certif. of Incorp. arts. III-V; *see also* Mot. Summ. J. Against Certain Former Members of the Cen. for Cls. Resolution 4-5, ECF No. 10275 ("Summ. J. Mot."); G-I Holdings Omnibus Mem. in Supp. of Mot. for Summ. J., July 15, 2010, ECF No. 10275-1 ("Summ. J. Mem."); Joint

---

[5] "Producers" is defined by the CCR governing documents as "persons that are or were engaged in the mining, manufacturing, production, processing, fabrication, distribution, installation, sale or use of asbestos or asbestos-containing products or that may have a liability with respect to asbestos-related claims." CCR Producer Agreement § 1, ¶ 9, Rossman Decl. ex. 3 at 4, July 15, 2010, ECF No. 10275-5.
[6] Producer Agreement § 1, ¶ 7, at 3.
[7] Herein, page references to the Producer Agreement are to the internal numbering.

Mem. of L. of U.S. Gypsum Co., Pfizer, Inc. & Quigley Co. in Resp. to Mot. for Summ. J. 1,

Sept. 9, 2010, ECF No. 10302 ("Joint Opp'n Mem.").

The Producer Agreement sets forth the CCR's roles and responsibilities as the agent for

its members:

> The Center shall administer, evaluate, settle, pay or defend all asbestos-related claims in a fair, cost-effective and expeditious manner. The Center shall handle each asbestos-related claim on behalf of all Participating Producer members, and shall not settle an asbestos-related claim on behalf of fewer than all Participating Producer Members.

Producer Agreement § VIII, ¶ 1, at 10-11 ("Claims Center Handling").[8]  The CCR is authorized

to "make payments and settle claims on behalf of Participating Producer members . . . ." *Id.*

§ VIII, ¶ 6, at 12. "As sole agent, the Center shall have exclusive authority and discretion to

administer, evaluate, settle, pay or defend all asbestos-related claims . . . ." *Id.* § IV, ¶ 1, at 8.

The CCR also billed and collected from the members and/or their insurers each member's

allocated shares of certain liability payments and expenses. The CCR "act[ed] as a conduit for

the payment by its members (and/or their insurers) of claims asserted against them. It received

funds from its members pursuant to an obligation to remit those funds to plaintiffs in settlement

of claims settled by the CCR acting as agent for its members. . . . [As well] The CCR, in

negotiating settlements as agent for GAF and each of the other named [CCR members], did not

become a party to such settlement agreements and did not agree to fund such settlement. Instead,

---

[8] "Asbestos-related claims" are defined in the Producer Agreement as:
> [A]ny claims or lawsuits against any Participating Producers or the Center, or against any Supporting Insurer based solely on the conduct of any Participating Producers, by whomever brought and in whatever procedural posture such claims or lawsuits may arise, seeking monetary relief (whether or not such relief is the only relief sought) for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing product; *provided*, that asbestos-related claims shall not include claims for damage to or destruction of property or statutory claims for compensation by an employee against an employer.

Producer Agreement § I, ¶ 2, at 3.

each member . . . was obligated to fund its share of the settlement as allocated by the CCR."
Decl. of Joseph Jordan, CCR Chief Financial Officer, Prieto Decl. ex. 1 ¶¶ 10, 12, Sept. 9, 2010,
ECF No. 10302-1 (originally filed as CCR Mem. in Supp. of Mot. for Order Granting Relief
from Automatic Stay ex. 1 ¶ 10, Oct. 9, 2001, ECF No. 608).

Members also have several roles and responsibilities with respect to in the CCR. First,
by becoming a member, a Producer

> designates the Center as its sole agent to administer and arrange on its
> behalf for the evaluation, settlement, payment or defense of all asbestos-
> related claims against such Participating Producer. As sole agent, the Center
> shall have exclusive authority and discretion to administer, evaluate, settle,
> pay or defend all asbestos-related claims, including the right to delegate to
> any person, upon consent of the Participating Producer in question, such
> authority and discretion with respect to designated asbestos-related claims
> against such Participating Producers.

Producer Agreement § IV, ¶ 1, at 7-8.

Members are responsible for paying their apportioned share of liability payments and "a
percentage share of allocated expenses attributable to each claim handled by the Center."
*Id.* § VI, at 9-10. The CCR determined shares as provided in Attachment A to the Producer
Agreement, and the apportionment established "the responsibility of each Participating Producer
for a percentage share of liability payments and a percentage share of allocated expenses
attributable to each claim handled by the Center as sole agent for such Participating Producer
under [Producer Agreement] Section IV." *Id.* § VI, at 9. The Agreement further provides: "To
the extent that a Participating Producer's percentage shares of liability payments and allocated
expenses attributable to a particular asbestos-related claim are not paid in a timely manner by
one or more of its Insurers . . . such Participating Producer shall pay in a timely manner the
percentages of liability payments and allocated expenses in question." *Id.* at 10.

Under the Producer Agreement, "[i]n the event that any Participating Producer's percentage shares of liability payments or allocated expenses are not paid in a timely manner, the Center's Board of Directors may direct the Center to institute an [alternative dispute resolution] on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations." Producer Agreement § XIV, ¶ 4, at 18-19. To support the CCR in its collection efforts if a Participating Producer did not meet its obligation, the CCR's Board of Directors adopted "Accounts Receivable Guidelines" in order to reinforce Members' obligation to pay their shares of "liability payments and allocated expenses" and to assist the CCR in "keeping its receivable accounts current [and] to provide for prompt resolution of matters delaying payment." Memorandum from Joseph Jordan, Chief Financial Officer, CCR, to all Participating Producers (July 15, 1993), Rossman Decl. ex. 4, at 2, July 15, 2010, ECF No. 10275-6. The Accounts Receivable Guidelines promulgate a procedure for collection of past-due balances, including issuance of a series of notices, and also vest the Board of Directors with discretion to "assure the Center is sufficiently protected" in the event of non-payment. CCR Accounts Receivable Guidelines, Rossman Decl. ex. 4, at 4, 5-7, 8, ECF No. 10275-6.

With respect to claims between Members, the Producer Agreement expressly provides: "[s]o long as it is a member of the Center each Participating Producer shall forego with respect to asbestos-related claims for contribution or indemnity (other than for contribution or indemnity assumed under written agreement) against all other Participating Producers that are members of the Center." Producer Agreement § XIV, ¶ 1, at 17-18.

Signatories to the Producer Agreement are members of the CCR until membership is terminated in a manner set forth in the Producer Agreement. Methods of termination include providing written notice and obtaining a determination that amounts due to the CCR have been

paid or provided for, as well as filing for bankruptcy protection. *Id.* § III, ¶ 2(a)-(c), at 6-7.

After termination, former members of the CCR no long have any of the rights or obligations of

membership; however, the former member "shall continue to have and to honor all of the

obligations incurred by it [under the Producer Agreement] or on its behalf as a member prior to

the effective date of its membership termination[.]" *Id.* § III, ¶ 3, at 7.[9]    Termination of

membership further:

> serve[s] immediately as a withdrawal by such Participating Producer of the
> designation of the Center as its sole agent . . . and shall terminate
> immediately the Center's right, authority and obligation to act on behalf of
> such Participating Producer with respect to any and all asbestos-related
> claims, whenever made or filed[.]

*Id.* § IV, ¶ 2, at 8.  If a Participating Producer terminates its membership, "the corresponding

shares of the other Participating Producers shall be increased appropriately to pick up the shares

of the withdrawing or terminating Participating Producer." Producer Agreement attach. A § F, at

26 (as amended December 1, 1991), Rossman Decl. at 23, 48, ECF No 10275-5.

The Producer Agreement confers rights and benefits

> only upon Participating Producers, Supporting Insurers that are paying
> unallocated expenses incurred by the Center and the Center, and is not
> intended to confer any rights or benefits upon any other persons.  No person
> other than the Center, a signatory hereto or a Supporting Insurer that is
> paying unallocated expenses incurred by the Center shall have any legally
> enforceable rights under the Agreement.  All rights of action for any breach
> of this Agreement by any signatory hereto are hereby reserved to the
> Center, Participating Producers and to Supporting Insurers that are paying
> unallocated expenses incurred by the Center.

---

[9] Section III, ¶ 3 provides, in full:
> Upon termination of membership and thereafter, a Participating Producer shall have none
> of the rights or obligations of a member of the Center, as set forth in the Agreement,
> Attachment A hereto and the Center's by-laws.  However, notwithstanding termination of
> membership, a Participating Producer shall continue to have and to honor all of the
> obligations incurred by it hereunder or on its behalf as a member prior to the effective date
> of its membership termination, including any retroactive adjustments of its percentage
> shares of liability payments and allocated expenses made pursuant to Attachment A hereto.
Producer Agreement § III, ¶ 3, at 7.

Producer Agreement § X, at 14.

Both G-I and the Former Members have terminated their membership in the CCR. GAF's membership in the CCR was terminated by resolution of the CCR's Board of Directors, pursuant to Producer Agreement § III, ¶ 2(c)(ii), after the Board determined that several of GAF's actions constituted a material breach of the Producer Agreement. The Resolution, dated December 17, 1999, stated the termination was to be effective at the close of business January 17, 2000, thirty days after the written notice of resolution of termination by the Board. Resolution & Notice of Termination ¶¶ 2-4, Rossman Decl. ex. 6, ECF No. 10275-8.

On June 25, 2001, U.S. Gypsum Corp. (USGC) filed a petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware, which terminated its membership in the CCR. Joint Opp'n Mem. at 9-10. Pfizer, Inc. ("Pfizer") and Quigley Co. ("Quigley") also terminated their memberships. *See* Summ. J. Mem. at 10 n.9.

### D. Relevant Proofs of Claim

By Order dated September 5, 2008, this Court fixed October 15, 2008, as the bar date by which all proofs of claim against any interest in the Debtors had to be filed, other than certain "Excluded Claims." Bar Date Order, Sept. 5, 2008, ECF No. 8257.

#### 1. CCR Proof of Claim

On October 9, 2008, the CCR filed a proof of claim in this proceeding alleging G-I was liable to the CCR for $299.5 million plus interest, fees, and expenses because G-I breached the terms of the Producer Agreement by failing to pay "Debtor's share of settlements . . . [and] Debtor's share of expenses that CCR incurred on the Debtor's behalf." CCR Proof of Claim ¶ 13, Rossman Decl. ex. 5, at 6, ECF No. 10275-7. The Proof of Claim itemized G-I's alleged liability to the CCR as follows:

10. Prior to the Petition Date, the CCR had paid out to asbestos claimants the aggregate net amount of $29,494,327 for the Debtor's share of settlements that the Debtor had not paid to the CCR. In other words, the CCR "fronted" $29,494,327 on the Debtor's behalf prior to the time the CCR stopped paying out the Debtor's shares of settlement to asbestos claimants. The CCR has never been repaid by the Debtor for those amounts.

11. In addition, prior to the Petition Date, the Debtor's unpaid share of expenses incurred by the CCR was $2,613,939. In other words, the CCR incurred expenses of $2,613,939 on the Debtor's behalf that the Debtor failed to pay. The CCR has never been repaid by the Debtor for those amounts.

12. Subsequent to the CCR's January 28, 2000 notice to GAF, a number of asbestos claimants voided their potential settlement agreements. Net of those voided settlements, the Debtor's unpaid shares relating to claimants to whom the CCR did not "front" the Debtor's share was $222,597,107.

*Id.* ¶¶ 10-12. The itemized alleged liability totals $254,705,373.00; the CCR Proof of Claim also demands interest, attorneys' fees, and expenses. *Id.* ¶ 13.

### 2. *Former Members' Proofs of Claim*

Prior to the general bar date, each of the Former Members filed a separate and timely proof of claim seeking to recover monies G-I allegedly should have paid to the CCR as its "share" of asbestos personal injury settlements, in breach of the Producer Agreement. *See* Summ. J. Mem. at 10; Joint Opp'n Mot. at 9.

USGC filed its Proof of Claim on October 15, 2008. USGC Proof of Cl., Rossman Decl. ex. 11, ECF No. 10275-13. As explained in the accompanying attachment, USGC asserts a breach of contract claim based on G-I's "fail[ure] to pay its share of asbestos personal injury claim settlements in accordance with the Debtor's contractual obligation as a member of the [CCR] and a signatory to the Producer Agreement," stating that as a result of that alleged breach, USGC "was required to pay substantial amounts in settlement payments for which the Debtor

was liable." *Id.* at 3. USGC asserts that in November 2000, "the CCR sought reimbursement from the remaining CCR Members, including USGC, for the CCR's payment of $30 million on behalf of Debtor that the CCR made to satisfy Debtor's share of Settlement Agreements," and that, as a result, "[USGC], on or about January 8, 2001, paid to the CCR by electronic transfer $10,104,042.61 to reimburse CCR for making such payments on Debtor's behalf and on behalf of another defaulting member of the CCR Asbestos Claim Management Corporation."[10] USGC estimates $6,316,000 of its January 8, 2001 payment is attributable to G-I, and it claims that amount from the Debtors as damages. *Id.*

Pfizer filed its Proof of Claim on October 15, 2008. Pfizer Proof of Cl., Rossman Decl. ex. 9; ECF No. 10275-11. In it, Pfizer seeks damages for G-I's "breach of the [Producer Agreement] due to its failure to pay to the Center for Claims Resolution its percentage share of liability payments with respect to settlements of Asbestos-Related Claims." It continues, "[a]s a result of [G-I's] failure to pay fund [sic] its percentage share of liability payments, Pfizer has been and will be required in the future to pay amounts in excess of its percentage share of liability payments established by the CCR in connection with settlement agreements entered into by the CCR on behalf of [G-I]." *Id.* at 3. Pfizer's claim is for "[n]ot less than $5,721,631.51." *Id.* at 2.

Quigley filed its Proof of Claim on October 13, 2008. Quigley Proof of Cl., Rossman Decl. ex. 10, ECF No. 10275-12. In it, Quigley uses similar language to describe its requested damages for G-I's "breach of the [Producer Agreement] due to its failure to pay to the Center for Claims Resolution its percentage share of liability payments with respect to settlements of Asbestos-Related Claims." *Id.* at 3. Quigley states its damages are unliquidated. *Id.* at 2.

---

[10] USGC identifies Asbestos Claims Management Corporation as the other "defaulting member" to whom a portion of its January 8, 2001 payment is attributable. USGC Proof of Cl. at 3.

### 3. CCR Settlement Agreement

Negotiations between the CCR and G-I resulted in a Settlement Agreement. Order Approving Settlement & Compromise of Certain Cls. Pursuant to the CCR Settlement Agreement, Rossman Decl. ex. 7, ECF No. 10275-9 (originally filed as ECF No. 9595). Under the CCR Settlement Agreement, G-I agreed to pay and the CCR agreed to accept a payment that would represent G-I's entire liability, as of the effective date of the Plan, to the CCR for G-I's share of "Liability Payments" and "Allocated Expenses" under the terms of the Producer Agreement. Summ. J. Mem. at 8. The "CCR Payment Amount" is "equal to the greater of (a) $9.9 million or (b) the amount that results from multiplying $110 million by the Asbestos Trust's Initial Payment Percentage." CCR Settlement Agreement ¶ 1, ECF No. 9467 ("Terms and Conditions").

The Former Members objected to the CCR Settlement Agreement, arguing that even though the CCR was paid in full by the Former Members, the CCR Proof of Claim included an alleged claim against G-I for amounts actually paid by the Former Members. The Former Members sought clarification that the Settlement Agreement would not and could not affect or operate to settle or release the Former Members' claims against G-I. Joint Opp'n Mem. at 11. Those objections were resolved by an agreement by G-I to add language to the proposed Order. *Id.*

On September 24, 2009, this Court entered an Order, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, approving the CCR Settlement Agreement. The Settlement Approval Order provides, in relevant part:

> The Settlement Agreement shall govern the treatment of all claims arising from, relating to or in connection with facts or legal relationships that existed among the CCR Parties and the G-I Plan Parties before or during G-I's chapter 11 case, and shall be binding on all entities asserting claims

against G-I that derive from CCR or depend upon CCR's rights. Upon entry of this Order, the CCR Payment Amount shall be the sole and exclusive source of payment in respect of any such claims. For the avoidance of doubt, nothing in this Order or the CCR Settlement Agreement shall release, prejudice, compromise or otherwise affect the claims, if any, that Former Members or the NGC Bodily Injury Trust, as successor in interest to the NGC Settlement Trust, have or may have against the G-I Plan Parties (as alleged in the Former Member's and NGC Bodily Injury Trust's proofs of claim) or the CCR or the defenses to such claims that may be raised by the G-I Plan Parties. The Court will address the claims of the Former Members and the NGC Bodily Injury Trust and objections thereto at a hearing or hearings to be set on notice at a date or dates to be determined.

Settlement Approval Order ¶ 6, ECF No. 9595.

#### 4. Treatment of CCR & Former Members' Claims under the Plan

Treatment of the Former Members' claims and the CCR Claim varied under the proposed plans of reorganization. The terms of the Fifth Amended Joint Plan of Reorganization proposed to treat the timely filed claims of Former Members as disallowed, and, by classifying their claims as part of the "CCR Claim" in Class 8, eliminated Former Members' right to adjudicate the merits of their claims. Joint Opp'n Mot. at 11. The Former Members each filed an objection to that part of the proposed Plan. *Id.*; *see also* ECF Nos. 9453, 9456, 9459.

On October 5, 2009, Debtors filed an Eighth Amended Joint Plan of Reorganization, which contained modifications reflecting negotiations between Debtors, the Committee, and other parties. 8th Am. Joint Plan of Reorg., Oct. 5, 2009, ECF No. 9644. The U.S. District Court for the District of New Jersey, Chief Judge Garrett E. Brown, and this Court held the confirmation hearing on September 30, 2009; October 5, 2009; October 6, 2009; October 15, 2009; and November 7, 2009. The District Court and this Court jointly approved Debtors' Eighth Amended Joint Plan of Reorganization. Confirmation Order, Nov. 12, 2009, ECF No. 9787; *see also In re G-I Holdings, Inc.*, 420 B.R. 216 (D.N.J. 2009).

14

The Eighth Amended Plan provides, *inter alia*, payment pursuant to the CCR Settlement Agreement will discharge Debtors of all claims in Class 8. Class 8 contains "any claim arising from facts or legal relationships that existed before or during G-I's bankruptcy that the CCR or its members, in their capacity as such, have asserted or could assert against G-I or its bankruptcy estate, including . . . any Claim for compensatory damages, contribution, indemnity, payment, reimbursement, subrogation, or any other remedy." 8th Am. Plan § 1.135. The Class 8 claims are based upon:

> (i) alleged breach by G-I of the CCR Producer Agreement or any amendments thereof; (ii) alleged payment or advances of funds, or financing of expenses, by or through CCR on G-I's account or for G-I's benefit; and (iii) any liability or expense allegedly incurred or paid by or through CCR as a result of G-I's failure or refusal to pay any obligation it allegedly incurred under any agreement made by CCR, during G-I's membership in CCR, for the settlement of any asbestos-related personal injury or wrongful death Claim; provided, however, that the CCR Claim shall not include the Former CCR Member Claims to the extent such claims are allowed . . .

*Id.* The Eighth Amended Plan also provides in relevant part that the parties would preserve their claims and defenses for later adjudication:

> Debtors believe the Former CCR Member Claims are derivative of the CCR Claim, and holders of Former CCR Member Claims have no individual right to assert such Claims against G-I; thus Debtors believe the CCR has compromised and settled these derivative Claims pursuant to the CCR Settlement Agreement; *provided, however*, to the extent the Former CCR members Claims become Allowed Former CCR Member Claims, such Claims shall be entitled to the treatment provided for Allowed Claims in Class 3A.

*Id.* § 3.13(b)(ii); *see also* Summ. J. Mem. at 9; Joint Opp'n Mem. at 11-12. Thus, to the extent this Court determines the Former Members' Claims are allowed, those claims are not included in the CCR Claim and instead are entitled to the treatment for allowed claims in Class 3A (G-I Unsecured Claims). The Plan provides each holder of an allowed claim in Class 3A shall receive

15

cash in an amount equal to 8.6% of such allowed claim. *See* Joint Opp'n Mem. at 12 (citing 8th

Am. Plan § 3.5(b)). *But cf.* Summ. J. Mem. at 10 n.7 (arguing that while the plan provision does

specify that to the extent the Former Members' Claims are allowed, those claims will not be

considered part of the CCR Claim, the Former Members lack standing entirely to bring these

claims, and thus the claims should be disallowed and expunged).

### E.    *G-I's Motion for Summary Judgment*

G-I filed the instant Summary Judgment Motion on July 15, 2010. Debtors seek

summary judgment disallowing Former Members' claims and expunging those claims from the

claims register because, G-I argues, Former Members lack standing to bring breach of contract

claims against G-I for allegedly breaching the terms of the Producer Agreement. Debtors argue

firstly the Producer Agreement's terms explicitly authorize the CCR, not its members, to pursue

claims for unpaid shares of settlement and, therefore, the Former Members are barred from

enforcing its provisions against G-I directly. Secondly, G-I argues that under Delaware law,

because the complained-of breach of contract is not failure to make payments to the Former

Members but rather failure to make payments to the CCR, the Former Members' claims are

derivative of the CCR's claims against G-I, which have been prosecuted and settled. Thirdly,

Debtors argue that because the CCR has already settled any potential claims against G-I based on

or arising under the Producer Agreement, there is no claim left for the Former Members to

pursue, and, accordingly, they should seek recourse from the CCR, rather than the Debtors.

Summ. J. Mem.

On September 9, 2010, the Former Members filed a Joint Memorandum of Law in

Response to G-I's Summary Judgment Motion. In it, they argue they have standing under the

Producer Agreement's express terms because the delegation of agency to the CCR is limited to

asbestos-related personal injury claims brought against CCR members and the Former Members have terminated their CCR membership and with it, the corresponding delegation of authority. Further, the Former Members argue Delaware law supports the treatment of their claims for breach of contract as direct claims because the unique corporate structure of the CCR makes it merely a conduit and, therefore, both the injury and the benefit of the recovery from G-I's alleged breach is to the Former Members, not the CCR itself. Former Members also argue the CCR has no right to enforce the breach of contract claims against Debtors because the CCR was neither a party nor a signatory of the Producer Agreement nor did it suffer any harm from G-I's alleged breach. Former Members also allege neither the Settlement Agreement nor G-I's Eighth Amended Plan of Reorganization contain a bar to Former Members' ability to pursue G-I for the alleged damages. Joint Opp'n Mem.

G-I filed a Reply to Joint Memorandum of Certain Former Members and Memorandum of Law in Further Support of its Motion for Summary Judgment on September 30, 2010. In the Reply, it refutes the Former Members' interpretation of the Producer Agreement, arguing the Former Members merely select a portion of one contract provision to focus on, disregarding its context; essentially, G-I argues, to accept Former Members' interpretation would either nullify other contract provisions or render the contract internally inconsistent. Further, G-I asserts that because the claims Former Members are seeking to bring against G-I are for damages contractually owed exclusively to the CCR, those claims are necessarily derivative despite the CCR's corporate structure. G-I argues that based on the terms of the Producer Agreement, which are undisputed material facts before the Court, it is entitled to judgment as a matter of law. G-I Reply Mem.

## CONCLUSIONS OF LAW

### A. Jurisdiction

Adjudication of a claim arising in a bankruptcy proceeding is a core matter. 28 U.S.C.

§ 157(b)(2)(B). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the

Standing Order of Reference from the U.S. District Court for the District of New Jersey dated

July 23, 1984. Finally, venue is proper pursuant to 28 U.S.C. § 1409(a).

### B. Legal Standards

#### 1. Summary Judgment

Federal Rule of Civil Procedure 56(a), made applicable to these proceedings by Federal

Rule of Bankruptcy Procedure 7056, provides a court shall "grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law. The court should state on the record the reasons for granting or

denying the motion." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. [11]

The Supreme Court has defined an "issue of material fact" as a question which must be

answered in order to determine the rights of the parties under substantive law and which can only

properly be resolved "by a finder of fact because [it] may reasonably be resolved in favor of

either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986); *see also Justofin v. Metro.*

*Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004) ("A fact is material when its resolution 'might

affect the outcome of the suit under the governing law,' and a dispute about a material fact is

genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.'") (citing *Anderson*, 477 U.S. at 248).

---

[11] The quoted language is taken from the 2010 revision of Rule 56(a), which replaces the previous Rule 56(c). Notably, it replaces "genuine issue of material fact" with "genuine dispute as to any material fact." The cited cases all predate this new Code change and therefore use the older terminology.

18

The moving party bears the initial burden of demonstrating there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003). The burden then shifts to the nonmoving party, who must present evidence establishing a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* The nonmoving party must "make a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial." *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001).

Inferences and facts should be construed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir. 1995). However, parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-movant may not rely on mere allegations but must present actual evidence raising a genuine issue of material fact. *Anderson*, 477 U.S. at 249. In addition, a motion for summary judgment will not be defeated by "the mere existence" of some disputed facts. *Am. Eagle Outfitters v. Lyle & Scott, Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "If the evidence (offered by the nonmoving party) is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citation omitted). Only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Dehart v. Horn*, 390 F.3d 262, 267 (3d Cir. 2004).

Summary judgment may be proper even though some material facts remain disputed if, after all inferences are drawn in favor of the non-moving party, the moving party is entitled to judgment as a matter of law. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999).

"[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252.

The Third Circuit Court of Appeals has held the purpose of summary judgment is to avoid an unnecessary trial which results in delay and expense. *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir. 1974). However, summary judgment is considered a "drastic remedy" which is not to be granted liberally, and the Third Circuit has stated that "where there is the slightest doubt as to the facts," summary judgment may not be granted. *Id.; see also Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981). At the summary judgment stage, therefore, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Knauss*, 289 F. Supp. 2d at 549 (citing *Anderson*, 477 U.S. at 249).

### 2. *Allowance of Claims*

Section 502 of the Bankruptcy Code provides "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).[12] If a party in interest objects, a claim will not be allowed to the extent it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). "This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Surety Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007). This reading is based on the "basic federal rule" that assessing the validity of claims

---

[12] Rule 3007 of the Federal Rules of Bankruptcy Procedure dictates the procedural requirements for objections to claims. It requires objections to be made in writing and filed. Fed. R. Bankr. P. 3007. Local Rule 3007-1 of the District of New Jersey Local Bankruptcy Rules requires all motions with respect to chapter 11 claims be filed within sixty days of confirmation. District of New Jersey Local Bankruptcy Rules, D.N.J. LBR 3007-1.

generally requires bankruptcy courts to consult state law, as "creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Travelers*, 549 U.S. at 450-51 ("[W]hen the Bankruptcy Code uses the word 'claim' . . . it is usually referring to a right to payment recognized under state law."); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2005).

In evaluating a motion to disallow a claim, the facts must be construed in a light most favorable to the non-moving party. *Nat'l R.R. Passenger Corp. v. N.Y.C. Hous. Auth.*, 819 F. Supp. 1271, 1275 (S.D.N.Y. 1993); *cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

The burden of proof for claims under § 502(a) "rests on different parties at different times." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). The claimant must first allege facts sufficient to support the claim, and if that standard is met, the claim is prima facie valid. *Id.*; *cf. Ashcroft v. Iqbal*, 556 U.S. 662 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Twombly*, 550 U.S. at 556). Once the claimant's initial burden is satisfied, the burden of going forward shifts to the objector, who must then produce evidence "sufficient to negate the prima facie valid claim." *VFB, LLC v. Campbell Soup Co.*, 482 F.2d 624, 636 (3d Cir. 2007) (citing *Allegheny Int'l*, 954 F.2d at 173). If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

*Allegheny Int'l*, 954 F.2d at 173.  The burden of persuasion remains with the claimant throughout. *Id.*

### C.  Governing Law

The parties agree that to the extent this Court must apply state law, the laws of the State of Delaware should govern. Feb. 9, 2011 Hr'g Tr. 6-7 ("Hr'g Tr.").  Accordingly, because the CCR was incorporated in Delaware, this Court will apply the law of that state to interpret the terms of the Producer Agreement in order to determine whether Former Members have authority to pursue their claims thereunder.  Further, Delaware law also governs "[w]hether plaintiffs' claims are direct or derivative." *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 462-63 (D.N.J. 2005) (holding that such a determination "is a question of state law" citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991)).

### D.  The Producer Agreement

#### 1.  Parties' Positions

G-I argues the Former Members lack standing to file a proof of claim for breach of the Producer Agreement because the terms of the Producer Agreement are "clear and unequivocal: no current or former member can bring a claim against another CCR member for non-payment of amounts allegedly owed to the CCR."  Summ. J. Mem. at 12.  It argues the CCR was the appropriate party, per the express delegation of agency to the CCR and Producer Agreement § IV, ¶ 1—which provides only the CCR can initiate collection actions against its Members[13]—to bring any "asbestos-related" liability claims, and it did so, resulting in the settlement agreement. *Id.* at 19.

---

[13] That provision provides: "By becoming a signatory to the Agreement and a member of the Center, each Participating Producer hereby designates the Center as its sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against such Participating producer." Producer Agreement § VI, ¶ 1, at 7-8; *see also supra* Statement of Facts § C.

It further contends the delegation of authority in the Producer Agreement survives the termination of a party's membership in the CCR under Producer Agreement § III, ¶ 3 and that provision effectively bars any claims that accrued to the Former Members against any other CCR member before the termination of membership, and that therefore, whether the Former Members left the CCR has "no effect on their improper efforts to circumvent the express terms of the Producer Agreement." Summ. J. Mem. at 19. Alternatively, G-I argues the Former Members' rights under the Producer Agreement were terminated with their membership and, therefore, Former Members cannot seek to enforce the terms of the Producer Agreement against G-I because "upon termination, a Participating Producer shall have none of the rights of a member of the CCR." Id. at 20 & n.18 (quoting Producer Agreement § III, ¶ 3).

The Former Members argue that not only does the Producer Agreement not expressly bar their claims, but in fact gives the Former Members a right to recover. They argue G-I "simply ignores . . . the provision in the Producer Agreement that expressly recognizes that the Former Members can assert breach of contract claims." Joint Opp'n Mem. at 2.

They contend that in identifying an "express bar" to the Former Members' claims, G-I is ignoring the plain language of the Producer Agreement with respect to third party rights. Joint Opp'n Mem. at 9-10.[14] Arguing the CCR does not have the authority to bring claims against G-I as the Former Members' agent because each of the Former Members terminated their CCR membership, the Former Members counter G-I's argument that the CCR's agency is an obligation incurred as a CCR member. In so doing they argue "[t]he delegation of the CCR as an agent is not an 'obligation' under the Producer Agreement" and that G-I's characterization of the

---

[14] In support, the Former Members cite to Producer Agreement § X, which provides, in relevant part: "all rights of action *for any breach of this Agreement* by any signatory hereto are hereby reserved to the Center, *Participating Producers* and to Supporting Insurers that are paying unallocated expenses incurred by the Center." Joint Opp'n Mem. at 9-10 (quoting Producer Agreement § X, at 14) (emphases in Joint Opp'n Mem.).

delegation as such is at odds with § IV, ¶ 2, which provides "termination of a Participating Producer's membership in the CCR 'terminates immediately' the CCR's right to act on behalf of such Participating Producer." *Id.* at 11-12 & n.10.

Former Members further argue the provisions identified by G-I as the basis for the CCR's exclusive authority do not relate to the "rights of the CCR members as against each other, but, rather to the CCR's role in negotiating settlements of the claims brought by asbestos personal injury claimants against the CCR members." The Former Members point to Producer Agreement § VI, ¶ 1 as an example of how G-I's interpretation allegedly misinterprets the plain meaning of the Agreement. Producer Agreement § VI, ¶ 1, the Former Members argue, by its own terms relates directly to, or, alternatively is limited to, "asbestos-related claims." *Id.* at 10-11 & n.9.

The Former Members also argue G-I's interpretation conflicts with the express terms of § X, the Third Party Rights provision. They maintain § X expressly recognizes the Former Members' right to assert a claim for breach of the parties' agreement because that section reserves "all rights of action for any breach of [the] Agreement" to the CCR and Participating Producers, and the Former Members' claim that G-I breached its obligations to them under the Producer Agreement is "precisely the type of claim[] reserved to the Former Members by the express terms of the Producer Agreement." *Id.* at 10. Further, the Former Members allege

24

USGC's own Plan of Reorganization gave it the right to pursue its claim against G-I for breach of the Producer Agreement.[15]

In its Reply, G-I maintains that because the Producer Agreement's intent was to formalize a structure in which to settle asbestos-related cases as well as to limit cross-claims between the producers, the delegation of authority to pursue collection actions to the CCR is in furtherance of the cooperative collective process.  G-I Reply at 8 (citing § XIV, ¶¶ 1, 4 to demonstrate "quite clearly that a central feature of the Producer Agreement was to prevent internecine fighting among producers"). Further, G-I argues, the only way the Producer Agreement could implement the goals of its signatories is to "require that the individual producers give up their rights to sue one another directly," and to interpret the Producer Agreement any other way would be contrary to the intent of the parties. *Id.* at 13.

G-I argues the Former Members are asking this Court to "ignore the clear meaning of the Producer Agreement, by pointing to a single sentence, plucked out of context, from an entirely irrelevant provision."  G-I Reply at 2. It argues § X of the Producer Agreement, upon which the Former Members rely to argue their claims belong to them as parties to the Agreement, is "self-evidently" concerned only with limiting the rights of third parties and avoiding the creation of unintended third party beneficiaries, not limiting or defining the rights of the parties as against each other. *Id.* at 4.  To use Former Members' interpretation, it argues, would violate "three

---

[15] On June 16, 2006, the U.S. Bankruptcy Court for the District of Delaware and the U.S. District Court for the District of Delaware confirmed the First Amended Joint Plan of Reorganization of U.S. Gypsum Corp. and its Debtor Subsidiaries, dated March 27, 2006.  On June 20, 2006, the Plan became effective.  USGC argues that because its Plan provides that USGC retained and "may enforce, and shall have the sole right to enforce, any claims, demands, rights, and causes of action that any Debtor or Estate may hold against any Entity," and there was no objection to that provision, it has the sole right to pursue its claim against G-I.  Joint Opp'n at 18 (quoting USGC Plan of Reorganization §IV.H.1).  G-I argues in opposition that since the Former Members' claims are for breach of contract, the four corners of the contract control and may not be overridden by an interpretation of a provision in a plan of reorganization that would "imbue the reorganized debtor with more rights" than it had prior to the bankruptcy.  G-I Reply at 6 n.4.  At the February 9, 2011 Hearing, counsel for USGC clarified that its argument presumes that there is right to a claim, and that essentially it was explaining that not only did it not lose its claim in the process of reorganizing, but also it is the only entity that may assert the claim.  Hr'g Tr. 43:20-44:16.

fundamental canons of contract interpretation: (1) contracts must be read as a whole; (2) each

provision must be given effect; and (3) specific provisions trump general ones." *Id.* at 5.

G-I also argues the Former Members' contention that the Producer Agreement's

delegation of authority is not binding upon them because they are no longer CCR members is

unsubstantiated and cannot be supported by the Producer Agreement. G-I claims the Former

Members misconstrue Producer Agreement § IV, ¶ 2 because they ignore the limitations imposed

by § III, ¶ 3. *Compare* Producer Agreement § VI, ¶ 2 (providing that "[t]he Center shall serve as

the sole agent of each Participating Producer with respect to all asbestos-related claims so long

as such Participating Producer is a member of the Center"), *with* Producer Agreement § III, ¶ 3

(providing that "obligations" incurred by the Former Members during the period they were

members survive membership termination).[16] G-I contends that because the Former Members'

claims against G-I arose before Former Members terminated their CCR memberships, the

Producer Agreement bars them from "usurping" the CCR's authority to act as members' sole

agent with respect to asbestos-related claims, including those against G-I. G-I Reply at 7.

G-I contends simply terminating CCR membership does not grant the Former Members

rights against G-I that they did not have under the Producer Agreement, and, further, termination

does not free the Former Members from the obligations under the Producer Agreement. In

support, G-I argues that to allow the Former Members to proceed with their claims against G-I

would create an internally inconsistent interpretation of the Producer Agreement because, for

example, it would vitiate the ADR procedures and limitations in § XIV, ¶ 4.[17] *Id.* at 6 & nn. 3-4.

---

[16] See *supra* note 9 for the full text of § III, ¶ 3.
[17] In relevant part, § XIV, ¶ 4 provides: "In the event that any Participating Producer's percentage shares of liability payments or allocated expenses are not paid in a timely manner, the Center's Board of Directors may direct the Center to institute an ADR on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations." Producer Agreement § XIV, ¶ 4, at 19.

At the February 9, 2011 hearing, parties further argued their contrasting interpretations of the Producer Agreement's various provisions. G-I reiterated its position that the intent of the parties when signing the Producer Agreement was to minimize claims among the parties by creating a collective body and delegating agency to that entity, and the Former Members were aware of this intent as a party to the Agreement. *See* Hr'g Tr. 13:3-:6 ("[Former Members] knew and understood that [bringing shortfall claims] was the CCR, the collective entity's responsibility."). G-I asserted its interpretation of § X of the Producer Agreement, arguing it was "a miscellaneous or omnibus provision . . . essentially [ ] a boilerplate provision that says no one who's outside of the CCR arrangement . . . can invoke any rights." Hr'g Tr. 12:1-:2, :15-:20. Because it is a general provision, G-I argues § X is trumped by more specific provisions, including § IV and § XIV, that, respectively, explicitly delegate authority and agency to the CCR to pursue asbestos-related litigation and ADR proceedings against Participating Producers. *Id.* 13:10-:18.

G-I further argued the appropriate remedy for the Former Members is to pursue a claim against the CCR or to negotiate or arbitrate with it. Any recovery from G-I would constitute a windfall to the Former Members because they had the opportunity to negotiate when they terminated their CCR membership for all assets, including claims related to the alleged breach by G-I. *Id.* 14:12-15:22. Former Members' right to recover from other parties to the Producer Agreement is barred by the Producer Agreement § III, ¶ 3. *Id.* 16:18-:22, 16:25-17:2. Finally, G-I argues, status as "former members" means they have no right to recover against G-I; because G-I terminated its CCR membership before the Former Members did, the additional obligation was known to the Former Members at the time they terminated their memberships, and recovery should have been negotiated at that time with the CCR. *Id.* 18:7-:13.

The Former Members contested G-I's interpretation of the Producer Agreements' provisions regarding termination of membership, arguing that after termination, the delegation of agency to the CCR is instantly terminated and there is no provision of the Producer Agreement that bars the Former Members' assertion of "very straightforward breach of contract claims against G-I for the out-of-pocket losses that they suffered as a result of G-I's breach of the Producer Agreement." *Id.* 30:15-:19. Former Members argued there is a fundamental implied right for non-breaching parties to a contract to assert a claim against a breaching party, and assert that the third sentence of § X evidences that implied right. *Id.* 40:20-:23, 42:16-:20; *see also* Producer Agreement § X ("All rights of action for any breach of this Agreement by any signatories hereto are hereby reserved to the Center, Participating Producers, and to Supporting Insurers that are paying unallocated expenses incurred by the Center.").

Former Members further argued § XIV, ¶ 4 of the Producer Agreement—the ADR provision—is not applicable to their claims because: firstly, there is no bar in the Producer Agreement to the Former Members asserting breach of contract claims against another producer; secondly, the ADR provision permits the CCR to collect only on behalf of the Participating Producers, and the CCR's agency on behalf of the Former Members was terminated when they left the CCR; and thirdly, the "obligations" referred to in the Producer Agreement, which survive termination, should be read as monetary amounts—i.e., obligations to fund settlements entered into before termination—not an obligation to delegate authority to the CCR. Hr'g Tr. 33:10-39:17. Further, they argue, the canon of construction that gives weight to a specific provision over a general provision supports a narrow definition of "obligation," because the specific provision about terminating agency upon termination of membership overrides any argument that "obligation" encompasses delegation of agency authority. *Id.* 39:12-:17.

28

Former Members also contested G-I's interpretation of § IV, ¶ 1 of the Producer Agreement, the designation of the CCR as "sole agent" to pursue "asbestos-related claims." They argue the designation of agency does not apply to the immediate proceedings because the designation is limited by the Producer Agreement's terms to "asbestos-related claims" as defined by § I, ¶ II. *Id.* 32:8-33:9. In response, G-I argued, firstly, there was no mention in the Producer Agreement of the right to sue other members, but there was a specific delegation of authority to the CCR, and the specific delegation should trump an implied right of a party to a contract, pursuant to principles of contract interpretation. Secondly, it argues, the existence of the CCR would be meaningless if it did not have the authority to be "the hub of the wheel of all of the Participating Producers . . . . [The CCR was not] just hired to be a law firm or a processing agent . . . they were created by this agreement in order to serve the function of taking the individual members out of the business of suing each other." *Id.* 71:7-:21.

Finally, the Former Members argued recovery from G-I would not constitute a windfall to Former Members. They point to the CCR Settlement Agreement ¶ 9, which provides that the CCR will indemnify G-I for amounts it is required to pay with respect to former CCR members' breach of contract claims,[18] so therefore there is no risk of double payment by G-I. Thus, they argue, there is no risk of harm to the Debtors because of overpayment on claims settled with the

---

[18] The CCR Settlement Agreement ¶ 9 reads:

> CCR, for itself, its successors, and assigns, shall indemnify the G-I Plan Parties, and hold them harmless, up to the limit of the CCR Payment Amount, from any liability resulting from any claim asserted by any Member or former member of CCR based on or relating to (a) any alleged breach of the CCR Producer Agreement, any obligation derived therefrom, or any agreement related thereto; (b) any alleged payment or advance of funds, or financing of expenses, by or through CCR on G-I's account or for G-I's benefit; or (c) any liability or expense allegedly incurred or paid by or through CCR as a result of G-I's failure or refusal to pay any obligation it allegedly incurred under any agreement made by CCR for the settlement of any Asbestos Personal Injury Claim; *provided, however,* that it is a condition of CCR's indemnification obligation under this Section 9 that G-I continue, in good faith, to object to and defend against such claims by Members or former members of CCR unless and until such claims are disposed of by final order or unless otherwise agreed by CCR.

CCR Settlement Agreement 11, Prieto Decl. ex 3, Sept. 9, 2010, ECF No. 10302-2.

CCR. *Id.* 30:20-31:8. In response, G-I argued the Former Members' characterization of the

indemnity agreement contained in the CCR Settlement Agreement does not eliminate the risk of

a windfall to the Former Members. In support, G-I contends that regardless of whether the CCR

is characterized as a "conduit," the CCR Settlement Agreement provided for the payment of $9.9

million from the G-I estate to the CCR, and that sum is the proceeds of the CCR's claim that G-I

did not meet all of its monetary obligations under the Producer Agreement.[19] *Id.* 63:20-65:21.

The Former Members contest that argument, characterizing the Producer Agreement as,

fundamentally, "promises between the members" themselves rather than an agreement with the

CCR. They claim the CCR is no more than a conduit and the Former Members are the injured

party because the CCR itself did not fund the settlements, but rather the Former Members paid

G-I's obligations and the CCR simply took the money and remitted it to the asbestos claimants.

*Id.* 28:21-29:24, 76:1-:7, :17-:25.

### 2. *Standards of Law—Contract Interpretation*

When interpreting contracts, the Supreme Court of Delaware has given priority to the

intention of the parties at the time the contract is formed. *See E.I. du Pont de Nemours & Co. v.

Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *see also GMG Capital Invs., LLC v. Athenian

Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (giving priority to parties' intentions as

reflected in the four corners of the contract); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903

A.2d 728, 738 (Del. 2006) (finding that courts are to "effectuate the parties' intent"); *Hifn, Inc. v.

Intel Corp.*, 2007 WL 2801393, at *9 (Del. Ch. May 2, 2007) (quoting *Eagle Indus., Inc. v.

DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)); *Comrie v. Enterasys Networks,*

---

[19] Further, G-I argues, any objections to the settlement should have been made at the Bankr. R. Fed. P. 9019 hearing, because there is "no doubt" that part of the CCR's $299.5 million claim included the claims Former Members are claiming they are entitled to assert. Hr'g Tr. 64:21-65:25. Former Members object to this characterization, asserting that the Former Members have acted diligently with respect to claims: they filed claims as soon as there was a bar date; objected to the CCR Settlement; objected to the various plans; and "never suggested that someone else had these claims." *Id.* 77:10-:19.

*Inc.*, 837 A.2d 1 (Del. Ch. 2003) (holding that attempting, within reason, to fulfill the reasonable shared expectations of parties at the time they contracted is the primary goal of contract interpretation).

To determine the intent of the parties, courts look to the plain meaning of the language and terms within the four corners of the contract. *See GMG Capital*, 36 A.3d at 779; *Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010). To do so, the court examines the entire agreement to determine if the language clearly expresses the parties' intent. If it does and the terms of the contract are clear on their face, the court must apply the objective meaning of terms as a reasonable third party would understand them. *See GMG Capital*, 36 A.3d at 779; *Osborn*, 991 A.2d at 1159-60; *Lorillard Tobacco*, 903 A.2d at 739 (holding that a court is "constrained [in interpreting] by a combination of the parties' words and the plain meaning"); *Comrie*, 837 A.2d at 13; *see also Comet Sys. Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024 (Del. Ch. 2008) (finding a contract is not ambiguous simply because parties have conflicting interpretations, and whether ambiguity exists is a question of law for the courts). Delaware employs the objective method of interpretation of contract terms that are not defined within the contract—the meaning given is that which an objective, reasonable third party would understand. *See Osborn*, 991 A.2d at 1159, 1160 & n.21 (requiring the courts to use objective construction to determine a reasonable meaning of the contract's terms and defining an unreasonable interpretation as one that "produces an absurd result or one that no reasonable person would have accepted when entering the contract"); *Comet Sys.*, 980 A.2d at 1030 (finding contract terms to be controlling when a court use them to determine parties' common meaning); *cf. Lorillard Tobacco*, 903 A.2d at 738 (holding definitions in the contract control, but in absence thereof, courts look to dictionaries to define terms).

31

The meaning from one provision of a contract cannot control if that provision's meaning would contradict the meaning of the entire contract. Courts should give effect to all contract provisions. In *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, the Delaware Supreme Court held that:

> [i]n upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. . . . Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan . . . . To do so would be to violate the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions.

498 A.2d at 1113-14 (internal citations omitted); *see also GMG Capital*, 36 A.3d at 779; *Osborn*, 991 A.2d at 1159 (holding that courts must give each term of a contract effect so as not to render any part of the contract extraneous). Where all parties to a contract are sophisticated negotiators, they are assumed to have bargained for the terms of the contract. *Cf. E.I. du Pont de Nemours*, 498 A.2d at 1114 (finding where contract terms result from a series of negotiations between experienced drafters there is no reason to impose sanctions against the drafter merely because one party was the last to draft an agreement).

### 3. Opinion of Law—Producer Agreement

Here, G-I and the Former Members rely on various provisions of the Producer Agreement to argue the Agreement, respectively, bars the assertion of or provides an independent right to assert breach of contract claims by one producer against another producer for allegedly breaching the Producer Agreement by failing to fully meet its financial obligation to pay its allocated share of liability for asbestos-related settlements. The Producer Agreement itself governs whether Former Members have a right to bring a cause of action against G-I for its alleged breach. In order to determine whether the Agreement bars or provides such a claim, the

Court turns to the language of the Producer Agreement itself to determine the intent of the parties at the time of contracting.

With respect to the intent in creating the CCR, the Producer Agreement, in its introductory language, contains several broad statements of purpose including, most relevantly to this Summary Judgment Motion: "Participating Producers desire to enter into a constructive relationship with one another and to resolve any cross or counter claims that they may have against each other[.]" Although the Court primarily relies upon the four corners of the Agreement to determine the parties' intent, supplemental support for the CCR's purpose can be found in its Certificate of Incorporation and the CCR Bylaws. This intention is further supported by § XIV ¶ 1, which provides that during the pendency of membership, Participating Producers forgo, with respect to asbestos-related claims, indemnity and contribution claims against other members, other than those expressly assumed under written agreement. The explicit limitation of members' rights to bring claims against each other evidences the parties' intention to prevent internecine litigation.

Thus, while the CCR was created to expeditiously resolve the pending and future asbestos-related claims, it was also intended to standardize the relationships between the various asbestos producers, including G-I and the Former Members. Accordingly, the Court finds the Producer Agreement signatories intended to establish a cooperative, collective process for allocating asbestos liability and, in furtherance of that process, delegated to the new corporate entity the exclusive right to seek collection from a member that did not make a payment required under the Producer Agreement's allocation of a pro rata share of liability and expenses.

Having determined G-I and Former Members intended their relationship to be governed by the Producer Agreements' provisions, the Court next turns to what the parties intended by the

delegation to the CCR of authority to act as "sole agent" with respect to "asbestos-related claims" and for what period that agency was in effect. To define contract terms, the Court first looks at any definitions contained in the contract itself. Here, "asbestos-related claims" is defined by the Producer Agreement § I, ¶ 2 as "any claims or lawsuits against any Participating Producers of the Center, or against any Supporting Insurer based solely on the conduct of any Participating Producers . . . for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing product."

To interpret the extent and duration of the delegation of authority by the Participating Producers to the CCR, the Court looks at § III—Membership in Center; § IV—Submission and Withdrawal of Claims; and § XIV—Waivers, ADR, and Choice of Law. Keeping in mind that we must interpret contract provisions so that each provision is given weight and none is rendered superfluous, the Court will examine each in turn, then focus on how the Agreement as a whole governs the right of Former Members to assert claims against G-I.

As set forth above, § III governs membership in the CCR and the relevant periods during which members have the benefits and incur the obligations of membership. Section III, ¶ 1 provides that signatories to the Producer Agreement become CCR members at the time the Agreement is signed and with that membership "shall have all of the rights and duties of a member as set forth in the Agreement, Attachment A hereto and the Center's by-laws." Paragraph 3 of § III provides that upon termination of membership, former members no longer have the rights of members and cease to incur obligations under the Producer Agreement. The second sentence of ¶ 3, however, clarifies that although former members will not incur any new obligations, they still "shall continue to have and to honor all of the obligations incurred by it hereunder or on its behalf as a member prior to the effective date of its membership termination."

Thus, § III provides that the relevant period under the Producer Agreement is from the time the Producer Agreement is signed and a producer becomes a member of the CCR until such time as the Member terminates its membership, with the caveat that any obligations incurred during that period are still valid after membership is terminated. During the relevant period, the Producer Agreement and its provisions govern the CCR members' relationship with the CCR and with the other members.

Section IV of the Producer Agreement provides that from the commencement of membership in the CCR until termination of membership, CCR members designate the CCR as the sole agent to handle asbestos-related claims against the members and that as sole agent, the CCR "shall have exclusive authority and discretion" to handle those claims on behalf of the Participating Members. Upon termination of membership, the CCR's agency is terminated immediately. Thus, read in conjunction with § III, § IV provides that during the period the Producer Agreement governs the CCR members' relationship with the CCR and other members, the CCR is the sole agent for each CCR member and has exclusive authority, to "administer and arrange" for the handling of asbestos-related claims, including to "administer, evaluate, settle, pay, or defend" claims at its "exclusive authority and discretion."

Section XIV, ¶ 1 of the Producer Agreement provides that from the time a member signs the Producer Agreement and becomes a CCR member until such time as membership is terminated, each Participating Producer shall not bring claims for contribution or indemnity against other members. Paragraphs 3 and 4 provide that if a CCR member does not fulfill its obligations incurred under the Producer Agreement with respect to the liability payments or allocated expenses, the CCR may bring an ADR against the member and that if there are any disputes as to the validity, interpretation, or application of the Producer Agreement, or "all

35

disputes concerning issues within the scope of the Agreement," an ADR may be instituted. Read

in conjunction with §§ III and IV of the Producer Agreement, § XIV thus provides that during

the time the Producer Agreement governs the relationship among the CCR members and the

CCR, as well as the obligations that arise during that period, CCR members may not bring claims

for contribution or indemnity against another CCR member and, if obligations are not fulfilled,

the CCR is the appropriate party to pursue collection actions, including an ADR.

Applying that reading of the Producer Agreement, the Court finds that here, G-I's

obligation to pay its allocated share of liabilities and expenses for the asbestos-related settlement

arose during the period it was a member, and therefore the Producer Agreements' provisions

govern the treatment of G-I's alleged failure to honor that obligation. The Former Members

were also CCR members at the time G-I's obligation arose, and, therefore, the relationship

between Former Members and G-I was governed by the Producer Agreement and the Former

Members are therefore barred from bringing an indemnity or contribution action against G-I at

the time G-I allegedly did not uphold its obligations. Under the Producer Agreement, the CCR

had the exclusive right to not only impose obligations on G-I as a CCR member but also to

institute a collection action and/or an ADR for G-I's failure to uphold its responsibilities.

The Former Members' construction of § IV, ¶ 2 to mean that the CCR's ability to bring

claims on behalf of members ends upon termination of the membership and their argument that

thus the Producer Agreement expressly provides a right to bring breach of contract claims

directly against other members, does not properly construe all of the terms of the contract so as

to construct an objectively reasonable reading of the Producer Agreement.

Similarly, the Court finds unconvincing Former Members' reading of §§ IV and X of the

Producer Agreement. The Court determines that, when read in its entirety, § X clearly and

unambiguously limits the rights of third parties and avoids the creation of unintended third party beneficiaries. The Former Members argue that after termination of the Former Members' membership and the resulting termination of the CCR's agency to handle asbestos-related claims, the CCR is the improper party to bring breach of contract claims against G-I and that the Producer Agreement creates a right for Former Members to bring an independent action against G-I. That reading would be in direct contravention of § XIV's limits on Participating Producers' ability to seek contribution and indemnification during their membership. Moreover, that reading would create a unreasonable result, because a producer could have joined the CCR, received the benefit of the collaborative and collective process, then terminated its membership and pursued the other members of the CCR for indemnity or contribution claims. No reasonable party would, arguably, bargain for those terms nor would those terms give equal force to each provision of the Producer Agreement.

Thus, reading the Producer Agreement as a whole, giving plain meaning to those terms not expressly defined by the Agreement, and giving effect to each of the contractual provisions, the Court finds Participating Producers (i) elected to rely exclusively on the CCR to settle and pay asbestos claims and to collect payments from members, and (ii) agreed that upon termination of CCR membership, former members would continue to be bound by obligations incurred during the period it was a member. This Court concludes the CCR was authorized to resolve G-I's alleged breach of the Producer Agreement during the period in which G-I was a member and that the Former Members are contractually barred from pursuing claims, including breach of contract claims, against G-I independently of the CCR.

The Court finds, further, G-I's previous settlement with the CCR for approximately $9.9 million, which was approved by this Court prior to the confirmation of the Eighth Amended

37

Plan, settled all claims the CCR had against G-I arising out of G-I's membership in the CCR,

including G-I's alleged breach of the Producer Agreement by virtue of its failure to pay its share

of asbestos-related personal injury settlements made by the CCR on behalf of its members.

Accordingly, the Producer Agreement does not confer standing upon the Former Members, and

their claims are duplicative of the CCR's and must be dismissed accordingly.

### E. Standing of Former Members to Bring Breach of Contract Claims

Having found the Producer Agreement did not create an independent right of action, the

Former Members' standing now turns on whether their claims are direct or derivative. The issue

is whether the claims asserted by the Former Members are derivative causes of action (i.e.,

claims alleging injury to the CCR in its corporate capacity) or direct, individual causes of action

(i.e., claim alleging injuries to the Former Members alone which are not derivative of the CCR's

rights).

Whether an action is characterized as direct or derivative is a question of state law. *See*

*In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 462 (D.N.J. 2005) (citing *Kamen v.*

*Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991)). Courts look to the state of incorporation for

the applicable law. *Id.* Here, the parties do not dispute that Delaware state law applies to the

extent state law is applicable. Hr'g Tr. 6:18-7:6.

### 1. Parties' Positions

G-I claims the Former Members do not have standing to bring the breach of contract

claims because their causes of action are purely derivative (or "entirely duplicative") of the

CCR's claims. Summ. J. Mem. at 1-2.

Asserting the correct question is for the Court to consider whether the Former Members

or the CCR suffered harm by G-I's alleged non-payment, G-I argues that any damages to the

Former Members are based exclusively on damages suffered in the first instance by the CCR. Id.

at 12, 14, 15-16. G-I applies the standard from *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845

A.2d 1031 (Del. 2004) and argues the harm alleged here is a breach by G-I of its obligation

under the Producer Agreement and, therefore, the CCR is owed the duty because the obligation

to pay allocated charges ran to the CCR rather than other members individually.  Summ. J. Mem.

at 16.  With respect to the second prong of the *Tooley* test, G-I argues it "logically follows"

monetary recovery would belong to the CCR because the claims asserted consist of what each

Former Member deems to be their individual share of overall damages to the CCR caused by G-

I's alleged non-payment.  *Id.* at 18 (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351

(Del. 1988)).  G-I argues that "having structured their relations with G-I on a corporate basis, the

Former Members cannot be permitted to repudiate that structure now by prosecuting individual

claims against G-I for matters that fall within the CCR's purview."  Summ. J. Mem. at 19.

The Former Members argue firstly the distinction as to whether the claims are direct or

derivative is irrelevant because the Producer Agreement gives them the right to recover under its

terms.  Joint Opp'n Br. at 10-12 (citing Producer Agreement §§ IV, ¶ 2 and X).  They continue

and argue that under the *Tooley* test, the Former Members suffered the harm from G-I's alleged

breach because the Former Members funded the Settlement Agreements, while the CCR did not

suffer harm because it "merely forwarded the funds it received from the Former members to the

applicable asbestos claimants" rather than funding the Agreements itself.  *Id.* at 13.  As to the

recovery, they argue that since the Former Members were the ones who funded G-I's allocated

share of the Settlement Agreements, the Former Members should be the ones who receive the

benefit of any recovery.  *Id.* at 16.

The Former Members' claims based on breach of the Producer Agreement are direct, they argue, because breach of contract claims are direct in nature and also because the CCR, being only the agent who pursued collection claims on behalf of its Members, was not owed a duty by G-I. . The Former Members further argue that G-I cannot provide any evidence the CCR has suffered financial harm.

In fact, the Former Members contend that since they had terminated their membership pursuant to the Producer Agreement § III, ¶ 3, before the CCR asserted claims against G-I for.its alleged breach, the CCR did not have standing to bring those claims as an agent of the Former Members. In support, they note the CCR's collection rights could only be asserted "on behalf" of the Participating Producers. *Id.* (citing Producer Agreement § XIV, ¶ 4). The Former Members argue since the CCR itself has no right to assert similar claims against G-I, the Former Members' claims cannot be derivative because in order to be derivative, claims must properly belong to a corporation. *Id.* at 17-18 (citing *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1245 (Del. 1999) (stating a derivative claim is one that attempts to enforce a claim belonging to a corporation)).

Former Members also contend the "unique business arrangement" of the Producer Agreement and the CCR require the Court to "apply corporate law on derivative claims with flexibility to avoid injustice." *Id.* at 16 (citing *In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629, at \*2 (Del. Ch. Jan. 27, 2000)). Citing *Anglo American Securities Fund v. SR Global Fund* in support, the Former Members argue allowing the CCR to recover for G-I's alleged breach of the Producer Agreement, where the CCR was not a party to the Producer Agreement and did not fund any of the asbestos litigation settlements out of its own assets, would be akin to a windfall to the CCR. *Id.* at 16-17 (citing *Anglo Am. Secs. Fund v. SR Global*

40

*Fund*, 829 A.2d 143, 152 (Del. Ch. 2003) (holding some corporate entities may diverge "so radically," claims must be considered direct in order to enable those parties who are actually injured to recover while preventing a windfall to other parties)).

In its Reply, G-I argues Former Members misinterpret the focus of the *Tooley* test for determining whether a claim is direct or derivative. Former Members, G-I alleges, focus on whether they were harmed directly or indirectly, where the proper inquiry under Delaware law is to whom the damages are owed. Here, it contends, because the remedy sought is owed exclusively to the CCR, the claims for breach of the Producer Agreement are necessarily derivative. G-I Reply at 10. G-I argues there is "no clearer evidence" that the Former Members' claims are entirely derivative of the CCR claim than that the damages sought in the CCR Proof of Claim and the Former Members' proofs of claim are the same. *Id.* at 11. G-I characterizes Former Members' arguments as "equitable, rather than contractual or legal" and argues the Former Members cannot simply allege the Producer Agreement results in inequities and thus the claims must be considered direct. *Id.* at 12.

At the February 9, 2011 hearing, the parties reiterated their arguments with respect to the question of whether the Former Members' claims were direct or merely derivative of the CCR's claims. G-I argued the CCR properly owned the claims because G-I was paying the CCR and, should payments to cure the shortfall be ordered, G-I would be paying those to the CCR, not to other members as individuals. Further, it argues the dispute as to what the Former Members may recover is between the Former Members and the CCR, and the Former Members should have negotiated with the CCR at the time their memberships were terminated. Hr'g Tr. 20:5-:14.

Counsel for USGS responded on behalf of the Former Members and argued because the CCR was a non-stock, non-profit corporation with no material assets, the CCR could not have

possibly suffered harm when G-I allegedly refused to pay its pro rata allocated share of the
settlement payments because the CCR only ever passed along the payments from the
Participating Producers to the settling litigants. *Id.* 29:19-:24.

Counsel for Pfizer argued on the Former Members' behalf that the situation here can be
distinguished from a typical analysis under *Tooley* because the CCR is not a distinct legal entity
that could be ongoing despite a change in membership or that could suffer harm by losing assets
and because there is no mismanagement of the corporation, as is often evident in shareholder
derivative litigation. *Id.* 48:16-49:4-:8 (arguing the similarities between this case and *Tooley* are
"precious little other than the word 'corporation' and the State of Delaware"). Further, they
argue, the CCR does not, because of that structure, suffer a loss when one of the Participating
Producers does not meet their obligation under the Producer Agreement. The Settlement
Agreements are not corporate obligations of the CCR but rather obligations of the current or
former members. *Id.* 50:24-51:15. The CCR is a conduit, they allege, and the Former Members
essentially paid G-I's obligations by remitting money to the CCR, and the CCR immediately
remitted those funds to the asbestos claimants, essentially "passing along the money [Former
Members] provided the CCR." *Id.* 76:1-:25.

The Former Members argued that while analyzing traditional shareholder derivative suits
is helpful, the more relevant line of cases are those that take into account alternative corporate
structures. Relying primarily on *Anglo American Securities Fund*, and *Cencom*, the Former
Members contend the first step for the Court to take in a *Tooley* analysis when determining
which entity suffered the harm is to look at the facts of how the entity was set up. *Id.* 50:17-:19.
They analogize the relationship between the CCR and the Participating Producers to a fund
where limited partners buy in to create the entity and where the enterprise is therefore considered

42

little more than an "amalgam of individual stakes." *Id.* 51:16-52. Finally, they argue, common sense dictates the Former Members' claims are direct by their very nature—i.e., to recover for out-of-pocket losses that arose from a breach of contract by a party to the contract. *Id.* 54:14-:23.

G-I disagreed with the Former Members' characterization of the CCR's role and with the analogy to *Anglo American Securities Fund* and *Cencom.* Firstly, it argues, there is no injury to the Former Members that is not also an injury to the CCR, so the Former Members cannot meet the requirements to bring direct claims. *See id.* 67:6-:10, 72:12-:21, 73:1-74:17. Secondly, the very structure of bringing claims that are traditionally owned by a corporate entity is to promote the "gatekeeper" aspect of a corporation—shareholders (or here, the Participating Producers) cannot merely bring claims because they believe they have suffered injury. *Id.* 67:11-:22. G-I argued the instant case cannot be analogized to *Cencom* because there, the partnership had been dissolved and there was no entity from which the shareholders/partners could demand relief, where here, the Former Members could have (and, G-I argues, should have) negotiated with the CCR for the alleged "overpayment." *See id.* 73:3-:9, 74:9-:17. Similarly, it argues the factual distinctions between *Anglo American,* where there was a very specific provision of capital accounting within the partnership under which those who became partners subsequent to the injuring event would receive a windfall by recovery, and the immediate case, where there was a corporate entity, the CCR, that pursued claims both pre- and post-petition and subsequently settled, are too great for an accurate comparison to be made. *Id.* 73:10-74:17, 74:20-:25.

## 2. *Standards of Law—Derivative Claims*

Generally, a cause of action that belongs to a corporation can only be asserted by the corporation. In some circumstances, however, a shareholder may bring an action on the corporation's behalf. *Agostino v. Hicks*, 845 A.2d 1110, 1116 (Del. Ch. 2004). A derivative

claim is one brought by a shareholder on behalf of the corporation to redress injuries suffered by the corporation. A direct claim, on the other hand, is one brought by a shareholder for injuries suffered individually. *See Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund*, 829 A.2d 143, 150 (Del. Ch. 2003); *see also Penn Mont Secs. v. Frucher*, 502 F. Supp. 2d 443, 458 (E.D. Pa. 2007). Determining whether a claim is direct or derivative has been described as "frustratingly difficult to describe with precision." *Agostino*, 845 A.2d at 1117; *see Anglo Am. Sec. Fund, L.P.*, 829 A.2d at 150 ("Because harm to the entity will almost inevitably harm the stakeholders and because the entity itself is in some ways no more than an amalgamation of a certain subset of stakeholders' interests, differentiation of direct from derivative claims can be elusive.").

The Supreme Court of Delaware articulated the standard for distinguishing between direct and derivative claims in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*: "That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" 845 A.2d 1031, 1033 (Del. 2004).[20]

With respect to the first prong, to assert a direct claim, a shareholder must be able to prevail without showing injury to the corporation. To do so, the shareholder must show that the breach was of a duty owed to it, not to the corporation. *See Tooley, 845* A.2d at 1039; *see also Hartsel v. Vanguard Grp.*, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011); *In re JP Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 817 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006). If the corporation alone suffered harm, the corporation alone may recover, and the claim is derivative. If the shareholder suffered harm independently and is entitled to individualized

---

[20] The *Tooley* court expressly discarded what they referred to as the "amorphous and confusing concept of 'special injury,'" preferring the more straightforward requirement of requiring direct claims to allege injury distinct from the corporation's injury. *Tooley*, 85 A.2d at 1035; *see also Protas v. Cavanaugh*, 2012 WL 1580969, at *7 (Del. Ch. May 4, 2012).

recovery, the cause of action is direct. *See Feldman v. Curtaia*, 951 A.2d 727, 732 & nn.23-24 (Del. 2008).

Simply demonstrating it suffered an injury as a result of the alleged breach, however, is not sufficient to grant direct standing under *Tooley. See Feldman*, 951 A.2d at 733 & nn. 29-30; *see also Adelphia Recovery Trust v. Bank of Am.*, 2010 WL 2077214, at *8 n.16 (S.D.N.Y. May 14, 2010). "If the nature of the injury is such that it falls directly on the business entity as a whole and only secondarily on individual investors 'as a function of and in proportion to [their] pro rata investment in the [entity],' then the claim is derivative and may be prosecuted only on behalf of the entity as a derivative action." *Hartsel*, 2011 WL 2421003, at *16 (quoting *Kelly v. Blum*, 2010 WL 629850, at *9 n.63 (Del. Ch. Feb. 24, 2010)). The plaintiff's alleged injury must be compared to the injury to the corporation, not to that of other shareholders. *Id.* at *18.

With respect to the second prong, in order to obtain direct standing, the stockholder must show the remedy for the claim is one that flows to the plaintiff, not merely the same relief the corporation would receive. A direct claim is one in which "no relief flows to the corporation." *Hartsel*, 2011 WL 2421003, at *16 n.104 (quoting *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1179 (Del. Ch. 2006)). If the court finds, firstly, the corporation has suffered the harm and, secondly, it would receive its requested relief, then the asserted claims are derivative. *See Protas v. Cavanaugh*, 2012 WL 1580969, at *5 (Del. Ch. May 4, 2012) (citing *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *7 (Del. Ch. May 5, 2010)). If the plaintiff has asserted a direct claim, then the remedy for that claim must be one that flows to the plaintiff class; if the remedy for the nominally 'direct' claims would be the same as that for a derivative claim (or, to extend the analogy, to that for a claim asserted by the corporation), then the claim is derivative. *See Protas*, 2012 WL 1580969, at *8. Likewise, if the court finds all

shareholders are harmed and each would recover pro rata in proportion with their ownership of stock, then the claims are derivative. *Feldman*, 951 A.2d at 733; *see also Amusement Indus., Inc. v. Stern*, 2010 WL 2976199, at *5 (S.D.N.Y. July 26, 2010).

The court must attempt to ensure the appropriate party recovers for the alleged harm. Courts have denied direct standing where it would "unfairly advantage" the plaintiff over other unsecured creditors, but they have found it where the plaintiff is the only creditor who had been injured by the complained-of actions and therefore was the only party who should recover. *Compare Big Lots Stores*, 922 A.2d at 1179-80 (finding that allowing one unsecured creditor direct standing would circumvent the orderly relief proscribed by the Bankruptcy Code), *and Mann v. GTCR Golder Rauner, LLC*, 483 F. Supp. 2d 884, 898 (D. Ariz. 2007), *with Prod. Res. Grp. v. NCT Grp.*, 863 A.2d 772, 798 (Del. Ch. 2004) (finding that where there exist "circumstances in which directors display such a marked degree of animus toward[] a particular creditor with a proven entitlement to payment," that disallowing direct standing would prevent recovery by the one party to whom recovery was due).

To determine whether a claim is direct or derivative, courts must make an independent determination by looking at the body of the complaint, rather than the parties' designation or stated intention. *Agostino*, 845 A.2d at 1125 ("Equity's appropriate focus should be the alleged wrong, not the nature of the claim which is no more than a vehicle for reaching the remedy for the wrong."); *Anglo Am. Sec. Fund*, 829 A.2d at 150; *see also Penn Mont Secs.*, 502 F. Supp. 2d at 458-59; *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 996-97 (Del. Ch. 2004). In that determination, courts consider the nature of the wrong alleged and the relief requested by the parties. *Tooley*, 845 A.2d at 1036 (citing with approval *Agostino*, 845 A.2d at 1122); *see also Polak v. Kobayashi*, 2008 WL 4905519, at *7 ¶ 40 (D. Del. Nov. 13, 2008); *In re Dexterity*

46

*Surgical, Inc.*, 365 B.R. 690, 696 (Bankr. S.D. Tex. 2007); *Syncor Int'l*, 857 A.2d at 996-97

("[U]nder *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at

the form of words used in the complaint.").

Courts have found breach of contract claims to be direct where the alleged breach

directly interferes with the stockholder's contractual rights. *See Polak*, 2008 WL 4905519, at *8

¶ 41 (finding plaintiff's claims were direct where the alleged breach of contract impaired

plaintiff's contractual right to jointly manage the limited liability company). Additionally, courts

have found that under Delaware law, where harm is caused by a third party, a direct action can

be appropriate where the third party "contrived to destroy or circumvent the participatory or

commercial rights of certain shareholders in a manner that does no injury to the corporation.

*Sobchack v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 17 F.3d 600, 605-

06 (2d Cir. 1994) (clarifying, however, that where complete recovery by the corporation would

rectify the injury suffered, a derivative action is more appropriate).

However, merely looking at the type of claim that is being asserted cannot circumvent the

requirements imposed by the Delaware Supreme Court in *Tooley*. Arguments that allowing

direct standing would permit a greater overall recovery because the plaintiff would be able to

bring additional claims have been found unconvincing because although a greater recovery might

have been in the interests of equity, such allowance would "bypass" the *Tooley* requirements.

*Adelphia Recovery Tr.*, 2010 WL 2077214, at *9 n.19. Similarly, arguments that certain former

stockholders would not be able to recover under a derivative cause of action despite having

suffered an injury because they no longer owned stock in the corporation did not change the

nature of the harm, nor the derivative nature of the claim, but merely meant that those former

stockholders did not have standing to pursue derivative claims. *See Hartsel*, 2011 WL 2421003, at *19 n.123.

Delaware courts use the same standards for alternative business structures as for corporations, but allow some flexibility in applying those standards to allow the party that suffered the harm to recover. *Kelly v. Blum*, 2010 WL 629850, at *9 (Del. Ch. Feb. 24, 2010); *Amusement Indus.*, 2010 WL 29761199, at *5 n.6; *see Cencom*, 2000 WL 130629, at *2 ("Mechanistically applying the corporate common law rules surrounding derivative claims can defeat efficient resolution of claims. . . . [In cases] involving alternate business entities, the Court . . . recognizes the need for flexibility in determining its applicability."). In *Anglo American Securities Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, the Delaware Court of Chancery found the fund's structure and operation differed so radically from the traditional corporate structure that if the claims were classified as derivative rather than direct, it would have the "perverse effect of denying standing (and therefore recovery) to parties who were actually injured by challenged transactions." 829 A.2d at 150, 153. The court reasoned that because of the structure of the fund, a loss in value accrued irrevocably and almost immediately to the partners, so that "such losses confer only a fleeting injury to the Fund." Thus, the former partners had suffered harm at the time of the transaction, but if recovery was granted to the fund itself, the benefit would accrue to the current partners, which, the court held, would not provide a remedy to the wronged former partners and would constitute a windfall to the current partners. *Id.* at 152-53. Further, the court reasoned the parties, all having been sophisticated parties, appeared to have understood and voluntarily accepted the terms of the governing documents of the Fund. *Id.* at 154.

Courts have also applied a more subjective *Tooley* analysis where the business entity is all but defunct and shareholders and/or limited partners are attempting to recover for harms

suffered during the operation of the business entity. In *In re Cencom Cable Income Partners, L.P.*, a limited partnership was in the process of winding up its affairs, and passive investors in the partnership sought recovery against a controlling entity for breaches of fiduciary duties owed to the passive investors. 2000 WL 120629, at *1-*3. The Delaware Chancery Court found that, even though the claims were of the type that were generally considered derivative, because the dispute was a final dispute over the liquidation process and because there were only two parties in interest, efficient resolution would be more successfully achieved by the direct assertion of claims. *Id.* at *4. Similarly, in *Blystra v. FiberTech Group, Inc.*, direct standing was found where a limited partnership was defunct and a direct claim was the only way the former limited partners, who had actually suffered the injury, would recover because all but one of the limited partners had forfeited their interest. 407 F. Supp. 2d 636, 646-47 (D.N.J. 2005).

### 3. Opinion of Law—Standing of Former Members

At this point, the Court notes that the cases relied on by G-I are inapposite insofar as they are factually distinguishable from this case. G-I refers to a string of shareholder actions, including: *Sobchack*, 17 F.3d 600 (upholding the bankruptcy court's injunction barring holders of preferred stock from pursuing claims settled by the corporation); *Dexterity Surgical*, 365 B.R. 690 (overruling minority shareholders' objection to a settlement because the debtor-corporation's estate representative had the exclusive right to settle a corporate claim in state court); *Capital Z Financial Services Fund II, L.P. v. Health Net, Inc.*, 840 N.Y.S.2d 16 (App. Div. 2007) (dismissing investors' complaint where the alleged injuries were derivative of the corporation's losses and the corporation had previously settled the related claim); and *Pepe v. General Motors Acceptance Corp.*, 604 A.2d 194, 196 (N.J. Super. Ct. 1992) (affirming dismissal of a complaint by shareholders/guarantors because the asserted claims were "entirely derivative of the causes of

action which, but for their release by the bankruptcy stipulation, would be available to the corporations"). None of these cases approximate the factual situation here, where the Former Members contracted with G-I to form the business entity, expressly agreeing to appoint the CCR as their agent. Allowing the Former Members to assert a direct claim would, in essence, allow the Former Members to bypass the CCR's rights to recovery after contracting those rights away.

Turning to the required analysis under the *Tooley* standard, here the complained-of injury is, according to the Former Members, their "out-of-pocket" costs to pay more than their originally assessed share of the Settlement Agreements negotiated by the CCR on behalf of the CCR members because G-I allegedly breached the Producer Agreement.

Under the first prong of the *Tooley* standard, we turn first to a determination of whether G-I owed the duty to fulfill its monetary obligations under the Producer Agreement to the Former Members or the CCR. Here, pursuant to the Producer Agreement, the parties—all sophisticated negotiators—contracted to form the CCR in order to settle asbestos-related claims. As part of that contract, the parties expressly delegated the authority to pursue those claims to the CCR as their agent during the period of their membership. They also delegated the authority, as discussed *supra*, to pursue collection actions against the members of the CCR. Because the duty to pay the allocated portion of the Settlement Agreements was owed by G-I to the CCR as an entity under the terms of the contract as agreed to by all of the Participating Producers, including the Former Members, this Court finds the Former Members cannot demonstrate injury independently of injury to the CCR. Thus, the Former Members cannot fulfill the first prong of the *Tooley* analysis.

Further, although G-I's alleged failure to pay may have resulted in greater apportioned shares of liability and expenses related to the settlement payments for the Former Members,

these harms are merely an unavoidable result of the increased liability of all Participating Producers. Such equal injury, like other alleged breaches that impair an entire class of shareholders pro rata to their holdings, cannot be considered, or equated with, harm to specific shareholders so as to justify direct standing to assert breach of contract claims.

Nor can the Former Members demonstrate their contractual rights have been interfered with to the extent that direct recovery is the only way to remedy the injury. Unlike in *Polack*, where the breach materially interfered with limited partners' affirmative rights to participate in the management of the limited partnership, here the alleged breach was entirely encompassed by contractual provisions that governed a failure to pay allocated liability of the settlement payments. The Former Members' role in the asbestos-liability settlement process was not a managerial role, but rather was constrained by the delegation of authority to the CCR. Therefore, we cannot find a similar injury to that in *Polack* which would entitle the Former Members to recover directly for G-I's alleged breach of the Producer Agreement.

The Former Members' argument that the structure of the CCR is sufficiently different from the traditional corporate structure to justify direct, rather than derivative standing, like in *Anglo American*, is unconvincing. In that case, the court examined the factual circumstances and found that without the ability to directly assert claims, the injured parties would be unable to recover. Here, assuming *arguendo* the Former Members are the injured party, they are not without bargained-for remedies pursuant to the Producer Agreement. With respect to the funds the Former Members claim to have already paid—$6,316,000 as listed by USGS in their Proof of Claim, "[n]ot less than $5,721,631.51" as claimed by Pfizer, and Quigley's unliquidated damages—the Court finds convincing G-I's argument that the proper party with whom to dispute recovery for the "out-of-pocket" costs was the CCR.

Additionally, permitting the Former Members to recover on claims the CCR has already asserted and resolved under a fully performed settlement agreement would constitute an impermissible double recovery against the reorganized debtors.[21]    To the extent the Former Members would have to pay "in the future" because of the alleged breach of the Producer Agreement, there is no recourse for the Former Members because the Producer Agreement provides that with the entrance and exit of any Participating Producer from the CCR, the members' pro rata shares of liability and expenses were adjusted to allocate the entire settlement agreement.    Any disputes over the allocation and assessment of charges from the CCR to its members are governed by the Producer Agreement § XIV, which provides that members or former members may institute an alternative dispute resolution proceeding or litigate with the CCR to determine proportionate shares.    Thus, the Court finds that the appropriate recourse, to the extent it is appropriate, would be for the Former Members to seek recovery from the CCR for any additional expense paid to fund the asbestos-related settlement agreements during the period the Former Members were members of the CCR.

The Former Members have failed to meet their burden to establish direct standing to assert a breach of contract claim against G-I for allegedly failing to make payments to the CCR as allocated pursuant to the Producer Agreement.

---

[21] Former Members' counsel argued at the February 9, 2011 hearing that ¶ 9 of the CCR Settlement Agreement, which provides the CCR would indemnify G-I for any amount G-I paid with respect to the Former Members' claims, vitiates any possibility of a double payment depending on this Court's determination of who owned the breach of contract claim. Hr'g Tr. 30-31. G-I responded that whether an indemnification provision exists has no bearing on whether the Former Members may recover directly against G-I. G-I Reply at 8 n.6. We agree that the indemnification provision is not relevant to the instant determination of the Former Members' standing.

CONCLUSION

For the reasons articulated above, summary judgment is appropriate in this case. The Producer Agreement does not provide independent rights to bring breach of contract claims against other Participating Producers, and the Former Members have failed to carry their burden of proving that they have standing to bring the claims alleged in their respective proofs of claim. G-I's Motion for Summary Judgment is GRANTED and Former Members' claims are hereby DISALLOWED and EXPUNGED.

An order shall be submitted in accordance with this Opinion.

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE

DATED: August 13, 2012

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. 9004-2(c)

RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI LLP
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800
Dennis J. O'Grady, Esq. (DO 7430)
Mark E. Hall, Esq. (MH 9621)

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7199
Andrew J. Rossman (AR 0596)
Scott C. Shelley (SS 1013)
Christopher Kercher (CK 1755)

Co-Attorneys for the Reorganized Debtors

| In re: | Chapter 11 |
|---|---|
| G-I HOLDINGS, INC. , et al., | Case Nos. 01-30135 (RG) and 01-38790(RG) (Jointly Administered) |
| Reorganized Debtors. | |

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF G-I HOLDINGS INC. RESPECTING CLAIMS FILED BY CERTAIN FORMER MEMBERS OF THE CENTER FOR CLAIMS RESOLUTION, INC.

The relief set forth on the following pages, numbered two (2) through three (3), is hereby ORDERED.

9-10-12 _____
USBJ

04000.61845/4922029.1

Page 2
Case Name: In re G-I Holdings Inc., et al.
Case No.: 01-30135 (RG) and 01-38790 (RG) (Jointly Administered)
Caption of Order: ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF G-I HOLDINGS INC.
RESPECTING CLAIMS FILED BY CERTAIN FORMER MEMBERS OF THE CENTER FOR
CLAIMS RESOLUTION, INC.

THIS MATTER having been opened to the Court by Riker, Danzig, Scherer,

Hyland & Perretti LLP, Dewey & LeBoeuf LLP and Quinn Emanuel Urquhart & Sullivan, LLP,

co-counsel to the reorganized debtors herein, G-I Holdings Inc. ("G-I") and ACI, Inc. ("ACI"

and together with G-I, the "Reorganized Debtors"), upon the Motion of G-I for an Order

Granting Summary Judgment pursuant to Fed. R. Bankr. P. 7056, respecting claims filed by

certain former members[1] (the "Former Members") of the Center for Claims Resolution, Inc. (the

"Motion"); and the Court having considered the pleadings submitted and the arguments

presented, if any; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. § 1334; and it appearing that due and proper

notice of the Motion has been provided; and it further appearing that there is no genuine issue of

material fact and that G-I is entitled to judgment as a matter of law; and for the reasons set forth

in the Court's Opinion, dated August 13, 2012; and good and sufficient cause appearing

therefore, it is hereby

ORDERED that, the Motion is granted in its entirety; and it is further

ORDERED that, pursuant to Fed. R. Bankr. P. 7056, G-I is granted summary

judgment against the Former Members with respect to claim nos. 1479, 6510 and 6642; and it is

further

ORDERED that all claims of the Former Members (including claim nos. 1479, 6510 and

6642) against G-I based upon, or arising under, the Producer Agreement Concerning Center for

---

[1] The three former members of the Center for Claims Resolution, Inc. are Quigley Company, Inc., United States Gypsum Company and Pfizer, Inc.

04000.61845/4922029.1
4276383v2

SHAPIRO, CROLAND, REISER, APFEL & DI IORIO, LLP
411 Hackensack Avenue
Hackensack, New Jersey 07601
Telephone:  (201) 488-3900
Fax:  (201) 488-9481
John P. Di Iorio, Esq.
Email: jdiiorio@shapiro-croland.com

-and-

WILK AUSLANDER LLP
1515 Broadway
New York, New York 10036
Telephone:  (212) 981-2300
Fax:  (212) 752- 6380
Hillary A. Jury, Esq.
Email: hjury@wilkauslander.com

*Co-Counsel to Appellant Quigley Company, Inc.*

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### Consolidated Case Nos. 13-3335 and 13-3336

| | |
|---|---|
| In re | Chapter 11 |
| G-I HOLDINGS, INC., *et al.*, (f/k/a GAF Corporation), | Jointly Administered |
| Reorganized Debtors. | Bankruptcy Case No. 01-30135 (RG) and No. 01-38790 (RG) |
| QUIGLEY COMPANY, INC., | |
| Appellant, | |
| v. | Civil Action No. 2:12-cv-06933 (DMC) |
| G-I HOLDINGS, INC., *et al.*, (f/k/a GAF Corporation), | |
| Reorganized Debtors. | |

### CERTIFICATE OF SERVICE

JOHN P. DI IORIO, being of full age, hereby certifies as follows:

1.      I am an attorney at law of the State of New Jersey and a partner in the law firm of

Shapiro, Croland, Reiser, Apfel & Di Iorio, LLP, counsel for Appellant Quigley Company, Inc.

2.      I certify that on August 13, 2013, I served a copy of the Appellant Quigley

Company, Inc.'s Concise Summary of The Case filed with the Court on behalf of Appellant

Quigley Company, Inc. on August 13, 2013, electronically with the Court and to all parties,

indicated below, entitled to service thereof by filing same with this Court's CM/ECF system, and

by first-class mail, by placing the within, enclosed in a post-paid wrapper, in a depository,

located in Hackensack, New Jersey, owned and exclusively controlled by the United States

Postal Service, addressed to the following:

| | |
|---|---|
| Riker, Danzig, Scherer, Hyland & Perretti, LLP<br>Attn: Dennis J. O'Grady, Esq.<br>      Mark E. Hall, Esq.<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, New Jersey 07962<br>Telephone: (973) 538-0800<br>Fax: (973) 538-1984<br>Email: dogrady@riker.com<br>      mhall@riker.com<br>*Co-counsel for the Reorganized Debtors* | Quinn Emanuel Urquhart & Sullivan, LLP<br>Attn: Andrew J. Rossman, Esq.<br>      Scott C. Shelley, Esq.,<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Fax: (212) 849-7100<br>Email: andrewrossman@quinnemanuel.com<br>      scottshelley@quinnemanuel.com<br>*Co-counsel for the Reorganized Debtors* |
| Sandak, Hennesey & Greco, LLP<br>Attn: Marc J. Kurzman, Esq.<br>707 Summer Street, Suite 300<br>Stamford, Connecticut 06901<br>Telephone: (203) 425-4200<br>Fax: (203) 325-8608<br>Email: mkurzman@shglaw.com<br>*Co-counsel for the Reorganized Debtors* | Greenberg Traurig, LLP<br>Attn: Alan J. Brody, Esq.<br>200 Park Avenue<br>P.O. Box 677<br>Florham Park, New Jersey 07932<br>Telephone: (973) 360-7900<br>Fax: (973) 301-8410<br>Email: brodyA@gtlaw.com<br>*Attorneys for Pfizer, Inc.* |

| | |
|---|---|
| Jones Day<br>Attn: Brian J. Murray, Esq.<br>     Brad B. Erens, Esq.<br>     Timothy W. Hoffmann, Esq.<br>77 West Wacker Drive, Suite 3500<br>Chicago, Illinois 60601<br>Telephone: (312) 782-3939<br>Fax: (312) 782-8585<br>Email: bberens@jonesday.com<br>     thoffmann@jonesday.com<br>*Attorneys for United States Gypsum Company* | Office of U.S. Trustee<br>Attn: Jeffrey M. Sponder, Esq.<br>One Newark Center<br>Newark, NJ 07102<br>Telephone: (973) 645-2379<br>Email: jeffrey.m.sponder@usdoj.gov |
| Wollmuth Maher & Deutsch LLP<br>Attn: Paul R. DeFilippo, Esq.<br>     James N. Lawlor, Esq.<br>500 Fifth Avenue, 12th Floor<br>New York, New York 10110<br>Telephone: (212) 382-3300<br>Fax: (212) 382-0050<br>Email: pdefilippo@wmd-law.com<br>     jlawlor@wmd-law.com<br><br>-and-<br><br>One Gateway Center, Ninth Floor<br>Newark, New Jersey 07102<br>Telephone: (973) 733-9200<br>*Attorneys for United States Gypsum Company* | |

3.     I certify that the foregoing statements are true to the best of my knowledge. I am aware that if any of the foregoing statements be willfully false, I am subject to punishment.

Dated: August 13, 2013

By s/John P. Di Iorio, Esq.
    JOHN P. DI IORIO, ESQ.